## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

RAVIDATH RAGBIR,

> Petitioner,

vs.

UNITED STATES OF AMERICA,

> Respondent.

No. 2:17-cv-1256-KM

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Ravidath Ragbir, originally from Trinidad and Tobago, was admitted to the United States as a lawful permanent resident in February 1994. In November 2000, he was convicted of wire fraud and conspiracy, and sentenced to 30 months' imprisonment. On the basis of his conviction of that aggravated felony, in August 2006 he was ordered removed from the United States. He was granted multiple stays of removal, but on January 11, 2018, was detained in anticipation of removal. Mr. Ragbir has petitioned for a writ of coram nobis in this court. He seeks to vacate his conviction (or alternatively, modify his sentence). The issues now before the court are (1) whether I have the authority to issue a stay, and (2) whether to issue a stay of Mr. Ragbir's removal while this action is pending. I have determined to grant the stay for a limited period, so that within 30 days a hearing can be held on the merits of the coram nobis petition.

This, I emphasize, is not an immigration case; it is a criminal matter. True, the request for a stay potentially implicates the scope of 8 U.S.C. § 1252(g), a provision that strips the federal courts of jurisdiction to overturn the Attorney General's exercise of discretion in certain matters related to removal of aliens. This case, however, is not a challenge to the actions of the immigration

1

authorities; it is a petition to vacate a criminal conviction, which, in other proceedings, may have the indirect effect of vitiating the basis for Mr. Ragbir's order of removal. The stay sought here is not a creature of immigration law; it is a component of a federal court's power to preserve the status quo pending the resolution of a criminal case that is properly before it. That power inheres in the judicial function. And that inherent power has a constitutional dimension, in that it permits the court to maintain a party's access to the court and preserve the court's ability to adjudicate the case fully and fairly. Ordinarily this would not be controversial; if the item in controversy were not a human being but a valuable painting, few would quarrel with an order that the artwork be kept within the jurisdiction while the case is pending.

Section 1252(g) was not intended to be turned loose upon the federal court system like a sorcerer's apprentice. It was intended to operate *within* the scheme of federal court review of immigration orders. It is a part of section 1252, a section concerned with "judicial review of final orders of removal." 8 U.S.C. § 1252 (Title); *see also* § 1252 (a)(1). This proceeding is not one to review actions of the immigration authorities. I think that the concerns underlying § 1252(g) are at their weakest, and the inherent judicial power at its strongest, in this non-immigration proceeding relating to the validity of a criminal conviction.

That this is a petition within a criminal case strengthens my determination, in this limited context, to give the bar of § 1252(g) a narrow reading. No one doubts the court's jurisdiction to decide this coram nobis petition, irrespective of the petitioner's immigration status. Inseparable from that jurisdiction is the jurisdiction to grant a stay *pendente lite*. I would not lightly surrender that essential judicial function; the government's proposed limit on the inherent powers of the judiciary, if it is to come, must come from a higher authority than this trial-level court.

The stay, moreover, will be granted. The merits are sufficient to justify preservation of the status quo; deportation would constitute irreparable harm;

and a stay is necessary to ensure due process and meaningful access to the court.

In saying that this is not an immigration case, I do not blind myself to the reality that, for deportable persons, a stay may be the object of, rather than an incident of, litigation. The court will not allow such a stay to be pressed beyond its proper purpose. To that end, I will schedule a hearing on the merits of the coram nobis petition within 30 days.

## I.  BACKGROUND[1]

Mr. Ragbir is originally from Trinidad and Tobago. (Gov't Ex. 1). He was admitted to the United States as a lawful permanent resident on February 15, 1994. (Gov't Ex. 1). Since September 23, 2010, he has been married to Amy M. Gottlieb, a U.S. citizen. (Castle Cert. ¶¶ 3, 15 & Ex. 1). A community activist, he is, for example, the Executive Director of the New Sanctuary Coalition of New York City, a network of interfaith organizations that works with individuals facing deportation. (Castle Cert. ¶ 13; Pet'n Ex. B ¶ 3).

On November 29, 2000, Mr. Ragbir was convicted of wire fraud and conspiracy based on his work at HFC, a mortgage lending company. (Gov't Ex. 2; Castle Cert. ¶¶ 5-6). For Sentencing Guidelines purposes, the parties stipulated that the loss was more than $350,000 but less than $500,000. *See* U.S.S.G. § 2F1.1. Ragbir was sentenced to thirty months' imprisonment and was ordered to pay $350,001 in restitution. (Gov't Ex. 2). The United States Court of Appeals for the Third Circuit affirmed his conviction on direct appeal. *United States v. Ragbir*, 38 F. App'x 788 (3d Cir. 2002).

---

[1]  Citations to frequently cited record items are abbreviated as follows:

Pet'n = Petition for Writ of Coram Nobis (ECF No. 1)

Pet'n Br. = Memorandum of Law in Support of Order to Show Cause and Motion for Emergency Stay of Removal (ECF No. 15)

Castle Cert. = Certification of Brittany Castle in Support of Request for Entry of Order to Show Cause and Emergency Motion for Stay of Removal (ECF No. 15-1)

Gov't Ex. = Government's Exhibits (ECF No. 22)

After completing his sentence, Mr. Ragbir was transferred to the custody of Immigration and Customs Enforcement ("ICE"). (Pet'n Ex. B ¶¶ 15-24). On August 8, 2006, an immigration judge determined that his conviction of a fraud in excess of $10,000 constituted an "aggravated felony" and thus ordered him removed. (Castle Cert. ¶¶ 7-8; Gov't Ex. 1). The IJ's decision was upheld by the Board of Immigration Appeals ("BIA") on March 14, 2007, and summarily affirmed by the Second Circuit on August 12, 2010. (Gov't Exs. 3, 4). In December 2011, Mr. Ragbir was granted a stay of removal by the ICE field office in New York City. (Castle Cert. ¶ 17). That stay was renewed in February 2013, March 2014, and January 2016. (Pet'n Ex. I).

Meanwhile, on March 15, 2012, Mr. Ragbir requested that the BIA reopen his removal order and adjust his status. The BIA denied that request on May 15, 2012. (Castle Cert. ¶ 18). On March 4, 2016, the Second Circuit denied Mr. Ragbir's appeal of that BIA decision. *Ragbir v. Lynch*, 640 F. App'x 105 (2d Cir. 2016). (*See* Castle Cert. ¶ 19.)[2]

There was a second prong to Mr. Ragbir's 2012 attack on the removal order. On November 30, 2012, he filed a petition for a writ of coram nobis here in the District of New Jersey, the district of his conviction. (12cv380, ECF No. 1).[3] That writ provides for a collateral attack on a criminal conviction for a person who is no longer "in custody" and therefore cannot seek habeas relief.[4]

On May 30, 2013, I administratively terminated the coram nobis action without prejudice on consent, to accommodate settlement discussions that were then underway. (Castle Cert. ¶ 20; 12cv7380, ECF No. 12). On February

---

[2]     The BIA ruled, *inter alia*, that Mr. Ragbir could not attack the underlying criminal conviction in administrative proceedings. Because any such ruling did not reach the merits, it would not prejudice this coram nobis petition.

[3]     A petition for a writ of coram nobis has traditionally been regarded as "a step in the criminal case, and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate civil Proceeding." *United States v. Morgan*, 346 U.S. 502, 505 n.4 (1954). I take that to be the case irrespective of whether, as here, the matter is filed under its own civil docket number.

[4]     *See Chaidez v. United States*, 568 U.S. 342, 345 n.1 (2013).

12, 2015, Mr. Ragbir filed an amended petition. (12cv7380, ECF No. 13). Mr. Ragbir and the U.S. Attorney's Office again consented to dismiss the petition without prejudice, this time so that Mr. Ragbir could pursue an application for a presidential pardon. (Castle Cert. ¶ 22; 12cv7380, ECF No. 30). On February 22, 2017, having received no communication regarding the disposition of his pardon application, Mr. Ragbir refiled his petition for coram nobis in this court. (Castle Cert. ¶ 23; 17cv1256, ECF No. 1).

The coram nobis petition in its current form challenges Mr. Ragbir's conviction on three main grounds: that the jury instructions included fundamental errors, that his conviction is based on a no-longer-valid theory of honest services fraud, and that he was prejudiced by ineffective assistance of counsel. (Pet'n Br. 11-15). He asks that this court vacate his conviction or, alternatively, vacate his sentence and provide him with a *Fatico* hearing to reevaluate the dollar loss for sentencing purposes. (17cv1256, ECF No. 1).

Now before the court is the question of whether I have the authority to issue a stay of Mr. Ragbir's removal order pending the resolution of his coram nobis petition. The Government argues that 8 U.S.C. § 1252(g) prevents a district court from issuing such a stay. Mr. Ragbir's removal is currently subject to a temporary stay in the U.S. District Court for the Southern District of New York, which may expire as early as March 26, 2018. He faces imminent deportation when the temporary stay expires. Thus I do not regard the stay application before me as redundant or moot.

## II.  DISCUSSION

### A.  Removability and the Scope of § 1252(g)

In the Immigration and Nationality Act ("INA"), Congress has specified classes of aliens who may be removed from the United States. 8 U.S.C. § 1227. An alien may be deportable for a number of reasons, including conviction of an aggravated felony. 8 U.S.C. §§ 1227–28. An aggravated felony includes "an offense that . . . involves fraud or deceit in which the loss to the victim exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(i). *See Nijhawan v. Holder*, 557 U.S. 29, 42,

129 S. Ct. 2294, 2303 (2009) (upholding immigration authorities' use of stipulated Sentencing Guidelines dollar loss amount to determine whether federal conviction for mail, wire, and bank fraud constituted an aggravated felony).

The deportation of aliens, however, is subject to the Attorney General's broad discretion. "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (internal citation omitted). The Attorney General has the discretion to decline to institute removal proceedings, to terminate proceedings, or to decline to execute a final order of deportation. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999).

> This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action. A case may be selected for deferred action treatment at any stage of the administrative process. Approval of deferred action status means that, for the humanitarian reasons described below, no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated.

*Id.* at 484 (quoting 6 C. Gordon, S. Mailman, & S. Yale-Loehr, *Immigration Law & Procedure* § 72.03 [2][h] (1998)).

The development of executive discretion in these matters had the unintended consequence of "open[ing] the door to litigation in instances where the [Government] chose *not* to exercise it." *Id.* For instance, aliens who were not granted deferred action or nonpriority sometimes maintained that the prosecution of removal proceedings against them was selective, in that it violated equal protection or due process through improper reliance on political considerations, race, religious affiliations, or political opinions. *Id.* at 485 (quoting Gordon, *supra*).

In response, Congress enacted (*inter alia*) 8 U.S.C. § 1252(g) to limit the courts' jurisdiction to hear challenges to the Government's exercise of its

discretion to prosecute removal proceedings. Section 1252(g), as amended, provides as follows:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).

The § 1252(g) case law deals primarily with direct review of ICE decisions, as opposed to cases, like this one, where the effect on ICE processes is ancillary. Still, that case law is useful in the interpretation of the scope of § 1252(g).

Section 1252(g) was designed to prohibit district court review of the Government's exercise of prosecutorial discretion in removal matters. It does not, however, prohibit district court review of *all* decisions relating to removal or deportation. The Supreme Court has explained that section 1252(g) applies to only three listed discretionary actions of the Attorney General:

> [Section 1252(g)] applies only to three discrete actions that the Attorney General may take: her 'decision or action' to *'commence* proceedings, *adjudicate* cases, or *execute* removal orders.' (Emphasis added).... It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.

*Reno*, 525 U.S. at 482.

I find further support for *Reno*'s view of the limited scope of 1252(g) in the recent case of *Jennings v. Rodriguez*, which interpreted 8 U.S.C. § 1252(b)(9) (discussing judicial review of orders regarding aliens who are applying for admission).[5] 583 U.S. ___, 2018 WL 1054878 at *7–*8, slip op. at

---

[5]      (9) Consolidation of questions for judicial review

7

8-11 (2018). Because that case is recent and therefore unfamiliar, I discuss it at greater length than it might otherwise warrant.

In Part II of that opinion, Justice Alito (joined only by Chief Justice Roberts and Justice Kennedy) interpreted, and by analogy relied on, § 1252(g), the provision at issue here. *Id.* (citing 8 U.S.C. § 1252(g) and *Reno*, 525 U.S. at 482–83). Justice Alito wrote that § 1252(b)(9)'s jurisdictional exclusion of "all questions of law and fact … *arising from* any action taken or proceeding brought to remove an alien" is not broad enough to encompass all actions that might arise in the context of an alien's custody. *Id.* (citing 8 U.S.C. § 1252(b)(9) (emphasis added)). He gave three illustrative examples of what he meant: Surely, Justice Alito reasoned, the jurisdictional exclusion would not bar a detained alien's *Bivens* claim based on allegedly inhumane conditions of confinement, a state-law claim for assault against a guard or fellow detainee, or a tort claim for a personal injury that occurred during transportation to a detention facility:

> The "questions of law and fact" in all those cases could be said to "aris[e] from" actions taken to remove the aliens in the sense that the aliens' injuries would never have occurred if they had not been placed in detention. But cramming judicial review of those questions into the review of final removal orders would be absurd.

*Id.,* 2018 WL 1054878 at *7. The phrase "arising from," wrote Justice Alito, cannot be read so broadly as to encompass any issue that would not have occurred but for the alien's detention. "[W]hen confronted with capacious phrases like 'arising from,' [the Court] ha[s] eschewed 'uncritical literalism'

---

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).

leading to results that 'no sensible person would have intended.'" *Id.* at \*8 (citing *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. ___, 136 S. Ct. 936, 943 (2016) and collecting cases).

Justice Alito concluded that the aliens' applications for release on bail did not implicate the section 1252(b)(9) bar on jurisdiction. Explicitly analogizing to § 1252(g), he wrote that the court must look to whether the alien's *claim* or cause of action *arose from* one of the "three listed actions of the Attorney General": "the decision or action by the Attorney General [1] to commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien under this chapter." *Id.*, slip op. at 10 (quoting 8 U.S.C. § 1252(g); bracketed numbers added). Approached literally, the grant of the detained aliens' applications for bail in *Jennings* could be viewed as affecting the Attorney General's execution of removal orders, the third action identified in *Reno*. Nevertheless, wrote Justice Alito, those bail applications did not in any meaningful sense *arise from* the execution of a removal order.

*Jennings,* a recent, authoritative restatement of the *Reno* view of § 1252(g), I take as a guide to interpretation.[6]

---

[6]     Justice Kagan having recused herself, eight Justices participated in the *Jennings* case. Because Justice Alito's opinion in Part II commanded the votes of only three Justices, I consider the concurring and dissenting opinions to delimit the Court's jurisdictional holding as to § 1252(b)(9). *See generally Marks v. United States*, 430 U.S. 188, 193 (1977) (where no rationale commands a majority opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds"). The *Marks* rule, by the way, is currently the subject of a pending Supreme Court case. *See Hughes v. United States,* No. 17-177, *https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/publi c/17-155.html.*

Justice Breyer, dissenting (joined by Justices Ginsburg and Sotomayor), briefly addressed the jurisdictional issue. The passage is terse, but it suggests that jurisdiction would be barred only as to a Court of Appeals' actual review of a final order of removal:

Jurisdiction also is unaffected by 8 U.S.C. §1252(b)(9), which by its terms applies only "[w]ith respect to review of an order of removal under [§1252(a)(1)]." §1252(b). Respondents challenge their detention without bail, not an order of removal.

The United States Court of Appeals for the Third Circuit has also elaborated on the *Reno* interpretation of § 1252(g). That section, in the Third Circuit's view, is neither a limited grant of jurisdiction nor a comprehensive door-closing provision. Rather, it removes certain specified challenges to the Attorney General's prosecutorial discretion from the courts' general jurisdiction:

> [Section 1252(g)] is not a sort of 'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review,' as it is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings. Instead, § 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.

*Chehazeh v. Attorney General*, 666 F.3d 118, 134 (3d Cir. 2012) (internal citations and quotation marks omitted); *see also Reno*, 525 U.S. at 485 n.9. Section 1252(g), then, prohibits judicial review of the Government's prosecutorial discretion to choose certain aliens for removal from among the larger class of those eligible for removal. *See Chehazeh*, 666 F.3d at 134.[7]

More broadly, § 1252(g) should be viewed in the context of its role within the statutory scheme and the evident statutory goal of limiting piecemeal

---

*Jennings, supra* (Breyer, J., dissenting; slip op. at 31). So the Breyer three and the Alito three add up to six votes in favor of the proposition that the district court had jurisdiction over the aliens' petitions for bail (although they reached opposing conclusions on the merits). The Alito view, being the narrower one, may be treated as authoritative with respect to the jurisdictional issue under § 1252(b)(9).

It is possible of course to disagree with the Alito view of jurisdiction or to doubt whether the jurisprudence under § 1252(g) applies in the context of § 1252(b)(9). *See, e.g., Reno*, 525 U.S. at 483. Justice Thomas, concurring (joined by Justice Gorsuch), would have held that § 1252(b)(9) barred jurisdiction altogether. Those two Justices, then, cannot be viewed as endorsing any part of the reasoning of Part II.

[7]     Thus a court may not review the Government's decision to "commence proceedings" against deportable aliens who alleged that they were targeted for deportation because of their affiliation with a politically unpopular group. *Reno*, 525 U.S. at 487-92. In contrast, however, a court may review a decision by the BIA, *sua sponte*, to reopen removal proceedings against an alien; that is not one of the three administrative decisions insulated from review by 1252(g). *Chehazeh*, 666 F.3d at 139-40.

interlocutory review. It is part of Congress's rewriting of immigration law to consolidate review of removal orders in a single appeal from a final administrative order, brought before the Court of Appeals. Thus *Reno* stresses that § 1252(g) is aimed at precluding review of specified *non-final* discretionary decisions, which might or might not in the end result in actual removal. 525 U.S. at 482–85. The section is "specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." *Id.* at 486.

From this case law, then, it is apparent that § 1252(g) is aimed at precluding judicial review of claims "arising from"—ordinarily, challenging—three discretionary decisions of the Attorney General along the road to removal. Outside of that specific area, a district court retains jurisdiction, even if the claims before it happen to touch upon removal proceedings.

### B. Stays, § 1252(g), and *Coram Nobis* Proceedings

A district court has jurisdiction under the All Writs Act, 28 U.S.C. § 1651, to issue a writ of coram nobis. That traditional writ permits an individual to collaterally attack his or her criminal conviction. *Chaidez v. United States*, 568 U.S. 342, 345 n.1 (2013). Coram nobis roughly serves the function of habeas corpus, permitting correction of errors "of the most fundamental character." *United States v. Morgan*, 346 U.S. 502, 512, 74 S. Ct. 247 (1954). The difference is that it applies to a person no longer in custody, but still suffering the collateral effects of a criminal conviction. *See id.*; *United States v. Osser*, 864 F.2d 1056, 1059-60 (3d Cir. 1988).

Nothing about Mr. Ragbir's status as a removable alien affects the Court's jurisdiction to review his underlying conviction. I do not understand any party to be saying that § 1252(g) deprives this Court of jurisdiction to entertain the coram nobis petition itself, merely because its outcome might undercut the basis of an order of removal. The authorities reviewed above— *Reno, Jennings,* and *Chehazeh*—suggest that such an expansive view would be untenable. The coram nobis petition does not in itself entail review of any action by the Attorney General or ICE, let alone any exercise of prosecutorial

11

discretion in removal proceedings. It asserts claims of error in the conduct of a criminal trial.

A § 1252(g) challenge is often intertwined with the issue of whether a petition to review actions of the ICE may be brought in federal court (or in a federal district court, as opposed to the Court of Appeals). No such issue arises here. The cause of action asserted here—a challenge to a criminal conviction *via* coram nobis—is one the court can and must hear. Rather, the more specific question is whether, *incident to* that unquestioned jurisdiction, the court retains its usual inherent authority to issue a stay *pendente lite*. And the question within that question is whether § 1252(g) negates that usual inherent authority because a stay would affect the removal, or at least the date of the removal, of the petitioner.

Now it is true that the issuance of a stay, while it does not impair the validity of the order of removal, may delay the execution of it. Nonetheless, I conclude that this court retains the authority to issue a stay here for three reasons. **(1)** Neither a coram nobis petition nor this motion for a stay is a "cause or claim" that "aris[es] from" the Attorney General's discretionary actions, within the meaning of § 1252(g); **(2)** § 1252(g), as interpreted in *Reno*, bars only judicial review of certain enumerated exercises of executive discretion to prosecute removal proceedings; and **(3)** The power to grant a stay is an inherent judicial power incident to the court's jurisdiction over a coram nobis petition, which has a Constitutional dimension in that it ensures orderly review and meaningful access to the court. The first two reasons are rooted in the technicalities of § 1252(g), but are necessary prerequisites to the presentation of the third, which is the heart of the court's analysis.

### i.    "Claim" or "cause" "arising from"

I first focus on two key phrases in the statute. Section 1252(g), recall, is not a general ban. It provides that, except as explicitly provided, "no court shall have jurisdiction to hear any *cause or claim* by or on behalf of any alien *arising from the decision or action by the Attorney General to commence proceedings,*

12

*adjudicate cases, or execute removal orders* against any alien under this chapter." (Emphasis added.) What is barred, then is a "cause" or "claim" that "aris[es] from" three identified exercises of prosecutorial discretion in removal matters. *See* Section II.A, *supra*. The stay sought here is not a "cause" or "claim" at all; it is an administrative step in a criminal case. Nor does it "arise from" the discretionary actions of the immigration authorities; the essential legal issues here are matters of criminal law.

First, an application for a stay *pendente lite* is not a "cause or claim." A cause or claim is the "legal theory of a lawsuit," the basis for a lawsuit, or the "assertion of an existing right."[8] The causes or claims in this coram nobis proceeding are matters of criminal law, and the proceeding itself is a phase of a criminal case.

A stay, by contrast, is "[t]he postponement or halting of a proceeding, judgment or the like." *Stay*, Black's Law Dictionary (9th ed. 2009). It is not an action against a party or individual. "[I]nstead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself." *Nken v. Holder*, 556 U.S. 418, 428 (2009). A stay is thus a temporary measure, put in place *while* the actual cause or claim is being adjudicated. A stay is not a challenge to the basis of removal or any action taken by the immigration authorities. The requested stay is merely a "temporary setting aside of the source of the Government's authority to remove," *id.* at 429, *while* the court adjudicates the *actual* underlying cause or claim: the criminal law matters

---

8     Black's Law Dictionary defines "cause of action" as "1. A group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person ... 2. A legal theory of a lawsuit ... 3. Loosely, a lawsuit." *Cause of action*, Black's Law Dictionary (9th ed. 2009). "Cause" can refer to, among other things, "[a] ground for legal action" or "[a] lawsuit; a case." *Cause*, Black's Law Dictionary (9th ed. 2009).

A "claim" refers to "1. The aggregate of operative facts giving rise to a right enforceable by a court ... 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional ... 3. A demand for money, property, or a legal remedy to which one asserts a right." *Claim*, Black's Law Dictionary (9th ed. 2009).

13

presented by the coram nobis petition. (The meaning of a traditional stay, and its relation to statutory standards, is discussed further in section II.B.2, *infra.*)

Second, a stay in these particular circumstances would not be one "arising from" the Government's discretionary decision in the immigration matter. Mr. Ragbir's claims, like the bail applications in *Jennings,* do not "aris[e] from" the action taken to remove him; at best, they arise in a but-for sense because of his "removable" *status.* "Arising" is a familiar concept; it refers to the law that creates the cause of action in suit. *Cf.* 28 U.S.C. § 1331; *Merrell Dow Pharms. Inc. v. Thompson,* 478 U.S. 804, 808 (1986); *American Well Works Co. v. Layne and Bowler Co.,* 241 U.S. 257, 260 (1916). As stated by Justice Alito in *Jennings,* the relevant inquiry regarding the jurisdictional bar is not any but-for test, but rather "whether *the legal questions* in this case arise from" an action taken to remove an alien. 2018 WL 1054878 at *8 n.3, slip op. at 10 n.3 (emphasis added); *see also id.* at *7.

Mr. Ragbir's request for a stay—like the request for bail in *Jennings* or the decision to reopen proceedings in *Chehazeh*—concededly bears some relation to the removal process. But it does not arise from that removal process. Neither the stay application nor the coram nobis petition presents any issue of immigration law. The stay requested here is a *status quo* stay, an administrative step that arises within this criminal case.

Thus the requested stay is not fairly regarded as a "cause or claim" that "aris[es] from" the removal, or not, of Mr. Ragbir.

### ii. Stay not directed at exercise of prosecutorial discretion

Section 1252(g) bars district-court review of three identified steps in the prosecution of removal proceedings. And it specifically is directed to the Attorney General's exercise of prosecutorial discretion in connection with those steps. *See* Section II.A, *supra.* This coram nobis petition, and the associated application for a stay, implicates neither.

As discussed above, *Reno* makes it clear that the § 1252(g) specification of three identified exercises of executive discretion is no mere technicality. It is

14

an implementation of the overall policy of eliminating interlocutory review of decisions along the road to removal, and consolidating review in a single appeal to the Court of Appeals. 525 U.S. at 482–85. Section 1252(g) is "specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." *Id.* at 486. This coram nobis proceeding simply does not implicate the "final order" aspect of review of removal orders.

Nor does Mr. Ragbir's coram nobis petition challenge the Government's exercise of prosecutorial *discretion*—quintessentially, though perhaps not solely, the selection for removal of particular aliens within the class of those eligible for removal. Rather, Mr. Ragbir asserts that he does not rightfully fall within that class of removable aliens *at all*. His petition is, in a sense, upstream of the immigration process. Once decided, it may go to the question of whether he rightfully belongs to the class of aliens (aggravated felons) as to which the Attorney General has the discretion to prosecute removal proceedings. The request for a stay does not involve "review" of the basis or permissibility of any discretion decision that has been made by the Attorney General.

As discussed above, the Government has very broad prosecutorial discretion in deciding which aliens, within the class of removable aliens, it will remove. I have applied that principle many times in my own cases. *See, e.g., Tasci v. Tsoukaris*, No. 13-cv-2438, 2013 WL 2146901, at *4-5 (D.N.J. May 14, 2013) (1252(g) bars alien's challenge on the basis that he was not a "priority for removal" because he would soon become a "primary caretaker of children" and had no criminal record); *Borodachev v. Rodriguez*, No. 13-cv-1999, 2013 WL 1949844, at *4 (D.N.J. May 8, 2013) (finding no district-court jurisdiction to review ICE's "discretionary decision denying [alien's] request to stay removal"). That principle dictates that I might have no jurisdiction, for example, to consider a challenge to removal based on the Attorney General's having proceeded against one alien convicted of an aggravated felony but not against another alien convicted of the same offense.

The petition for a writ of coram nobis in this case, however, questions Mr. Ragbir's conviction and sentence, not any exercise by the Attorney General of his discretion in immigration matters. Even if wholly successful, it would implicate a distinct issue: the question of whether Mr. Ragbir is guilty of an aggravated felony. That is a question not of executive discretion but of legal and judicial status under the criminal law.

So there is meaning in the distinction between a cause or claim that arises from the Attorney General's exercise of discretion and one that does not. That distinction expresses in different terms the distinction between an actual challenge to executive discretion and a stay incident to a recognized, traditional federal court cause of action that happens to bear on immigration matters.

To look at it another way, neither the coram nobis application nor the stay application is an attempt to review any action taken by the executive. The stay does not operate upon the government in its role as enforcer of the immigration laws; it operates on the government as litigant, *i.e.*, as the prosecutor of this criminal case.

Mr. Ragbir's coram nobis petition challenges his status as an aggravated felon, which renders him deportable, not the discretionary decisions of the Government in selecting or processing him for removal. For this reason, too, the stay he requests is not barred by section 1252(g).

### iii.  Stay as exercise of inherent authority

The stay requested here is an exercise of a judicial power that does not arise from immigration law, but inheres in a court's jurisdiction to decide a coram nobis petition. It is constitutionally necessary to guarantee the appropriate administration of a case and to provide a litigant with meaningful access to the court. Assuming that equitable power can be abridged, it cannot be abridged except by the clearest statutory command. *Califano v. Yamasaki,* 442 U.S. 682, 705 (1979) ("Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction.").

**First**, a stay is "part of [the court's] traditional equipment for the administration of justice." *Nken v. Holder*, 556 U.S. 418, 421 (2009) (citing *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9-10 (1942)). Such a stay does not compel government action and is not a coercive injunction; rather, it is a less drastic order entered only to preserve the status quo so that the court may effectively hear a case and grant relief if appropriate. *Id.* at 429-30. Such a status quo stay therefore does not trigger the "particularly heavy" burden that would attach to a mandatory injunction. *Advanced Oral Techs., L.L.C. v. Nutres Research, Inc.*, No. 10-cv-5303 DRD, 2011 WL 13881, at *2 (D.N.J. Jan. 3, 2011) (Debevoise, J.) (citing *Punett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980)).[9]

The Supreme Court has distinguished between an ordinary injunction and a *status quo* stay of removal in the context of 8 U.S.C. § 1252(f) (which limits the availability of an injunction):

> An alien seeking a stay of removal pending adjudication of a petition for review does not ask for a coercive order against the Government, but rather for the temporary setting aside of the source of the Government's authority to remove. Although such a stay acts to "ba[r] Executive Branch officials from removing [the applicant] from the country," it does so by returning to the status quo—the state of affairs before the removal order was entered. That kind of stay, "relat[ing] only to the conduct or progress of litigation before th[e] court[,] ordinarily is not considered an injunction."

*Nken*, 556 U.S. at 429-30 (internal citation and footnote omitted) (bracketed material in original).

---

9       *See also Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (burden for mandatory injunction is particularly heavy and requires indisputably clear right to relief); *Acierno v. New Castle Cty.*, 40 F.3d 645, 647, 653 (3d Cir. 1994) (noting that a "primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered," but imposing a particularly heavy burden for a mandatory injunction that would alter the status quo); *Reach Acad. for Boys & Girls, Inc. v. Delaware Dep't of Educ.*, 46 F. Supp. 3d 455, 470 (D. Del. 2014) (discussing mandatory vs. status quo injunctions).

A stay of Mr. Ragbir's removal operates in much the same way—not as a challenge to administrative action, but as a "temporary setting aside." Not entirely the same, of course; this is not a stay of an order pending review *of that very order*. Still, it is similar in that it relates directly to the conduct of litigation that is properly before the court, and relates only indirectly to the removal order. A stay would not constitute a prohibited coercive order against the Government. Rather, it would be an exercise of authority arising from the coram nobis proceedings over which this court inarguably possesses jurisdiction. It temporarily preserves the status quo while not calling into question the validity of the Government's decision to remove this alien, or to remove this alien rather than some other.

Consider also a page of history. Congress has, over the years, eliminated most forms of district court review, including habeas jurisdiction, over removal cases. That review function is for most purposes consolidated in the court of appeals. *See, e.g.*, 8 U.S.C. § 1252(a)(5), 1252(b)(9). *See also Nken,* 556 U.S. at 423–24 (reviewing history). But when, under prior law, district courts did exercise habeas jurisdiction over immigration proceedings, courts held that § 1252(g) did not remove their inherent authority to issue an ancillary stay. In *Wallace v. Reno*, 194 F.3d 279, 285 (1st Cir. 1999), the Government argued that § 1252(g) barred the district court from issuing a stay of removal pending its resolution of a habeas petition. The First Circuit disagreed:

> [W]here the district court has authority to grant habeas writs, we are unwilling to read section [1252(g)] as depriving the court of authority to issue traditional ancillary relief needed to protect its authority to issue the writ. *Cf. Pierre v. United States*, 525 F.2d 933, 936 (5th Cir. 1976); *Saini v. INS*, 64 F.Supp.2d 923, 925 (D. Ariz. 1999). To maintain habeas in the face of section [1252(g)], but deny the ancillary relief needed to make it meaningful, would be to strain at the gnat after swallowing the camel. The Supreme Court's surprisingly narrow reading of section [1252(g)], [citing *Goncalves v. Reno*, 144 F.3d 110, 122 (1st Cir. 1998)], certainly does not encourage us to enlarge the reach of that section.

*Wallace*, 194 F.3d at 285; *see also Henderson v. INS*, 157 F.3d 106, 131 (2d Cir. 1998).

This, too, I take as confirmation that the power to enter a stay is inherent in the process of federal court adjudication.

**Second**, the power to stay removal pending decision of a coram nobis petition is constitutionally required, to the extent it is necessary to ensure due process and meaningful access to the courts.

That right of "meaningful access," both generally and in relation to petitions for post-conviction relief, cannot be questioned. *See, e.g., Bounds v. Smith*, 430 U.S. 817, 821–24 (1977) (surveying case law striking down certain restrictions on the filing of habeas petitions); *see also BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (viewing right of access as a First Amendment right); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (viewing right as aspect of due process); *Johnson v. Avery*, 393 U.S. 483, 498 n.24 (1969) (Douglas, J., concurring) ("Reasonable access to the courts is … a right … secured by the Constitution and laws of the United States."). Where a stay is required to vindicate that right, the Court's inherent authority to issue a stay is rooted not only in the traditions of the common law, but also in its Article III powers.

Mr. Ragbir has argued that there were fundamental errors at his trial and sentencing, including constitutional errors. Without a stay of removal, it is doubtful that Mr. Ragbir would be able to meaningfully participate in the adjudication of his petition. Claims of ineffective assistance, for example, may well involve evidentiary disputes requiring a hearing. If deported, it is unlikely that he will be able to attend or participate in any hearings related to the merits of his petition. Should any relief be granted, he would likewise be impaired from participating in any retrial or resentencing. I have heard no commitment from the Government that, if removed, Mr. Ragbir would be paroled into the United States to attend and participate in court proceedings. A stay, then, may be necessary to ensure his meaningful access to this court in connection with the coram nobis proceedings.

19

Because a stay, and particularly one to safeguard meaningful access, lies within the inherent power of the court, it is justified here.

For the foregoing reasons, this court possesses jurisdiction over the question of whether to grant a stay. I next consider whether a stay is appropriate.

### C. Stay of Removal

A stay "is not a matter of right, even if irreparable injury might otherwise result . . . ." *Nken*, 556 U.S. at 427 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). A stay is an "exercise of judicial discretion" based on "the circumstances of the particular case." *Id.* at 433. "[T]he traditional stay factors contemplate individualized judgments in each case." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987); *see, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 708 (1997); *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). A motion to stay is granted at the court's discretion, but that discretion "is to be guided by sound legal principles," which have been distilled into consideration of four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 426 (citing *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005); *Hilton*, 481 U.S. at 776); *see Didon v. Castillo*, 838 F.3d 313, 319 n.12 (3d Cir. 2016); Fed. R. Civ. P. 62(c). Although the first two factors of the standard are the most critical, *Nken*, 556 U.S. at 434, I consider them all.

#### i. Likelihood of Success on the Merits

The petitioner seeking a stay must show a likelihood of success on the merits. A likelihood means "there is 'a reasonable chance, or probability, of winning.'" *In re Revel AC, Inc.*, 802 F.3d 558, 568-69 (3d Cir. 2015) (citing *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)). Therefore, "while it is not enough that the chance of success on the

merits be 'better than negligible,' the likelihood of winning ... need not be 'more likely than not." *Id.* (citing *Nken*, 556 U.S. at 434; *Singer*, 650 F.3d at 229).

Coram nobis is an "extraordinary remedy, and a court's jurisdiction to grant relief is of limited scope." *United States v. Stoneman*, 870 F.2d 102, 106 (3d Cir. 1989). The writ will issue in cases of error "'of the most fundamental kind, that is, such as to render the proceeding itself irregular and invalid.'" *United States v. Cariola*, 323 F.2d 180, 184 (3d Cir. 1963) (quoting *United States v. Mayer*, 235 U.S. 55, 69 (1914)). The writ of coram nobis "is an ancient common-law remedy designed to correct errors of fact"; however, "in its modern iteration *coram nobis* is broader than its common-law predecessor." *United States v. Denedo*, 556 U.S. 904, 910-11 (2009) (internal quotation marks omitted). Coram nobis can be used to "redress a fundamental error" in a "potential universe of cases that range from technical errors to fundamental ones." *Id.* at 911. Out of respect for the finality of judgments, relief is limited to "'extraordinary' cases presenting circumstances compelling its use 'to achieve justice'" and where alternative remedies, such as habeas corpus, are not available. "[E]arlier proceedings are presumptively correct and the petitioner bears the burden to show otherwise." *United States v. Babalola*, 248 F. App'x 409, 412 (3d Cir. 2007) (citing *Cariola*, 323 F.2d at 184).

One jurist, with his accustomed panache, has called coram nobis the criminal-law equivalent of a "Hail Mary pass."[10] Thus the government is not

---

[10]    "A Hail Mary pass in American football is a long forward pass made in desperation at the end of a game, with only a small chance of success. The writ of error coram nobis is its criminal-law equivalent." *United States v. George,* 676 F.3d 249, 251 (2012) (Selya, J.). Of course, a small chance is greater than no chance at all; even Hail Mary passes may be caught, sometimes even in overtime. And district courts will grant writs of coram nobis in appropriate cases. *See, e.g., United States v. Gonzalez,* Nos. 3-20136-01-KHV, 16-2286-KHV, 2016 WL 2989146 (D. Kan. May 24, 2016) (granting a writ of coram nobis where the defendant's prior conviction no longer qualified as a "predicate felony" and where he was actually innocent of the charge); *Colino v. United States,* No. SACV 11-904 DOC, 2012 WL 1198446 (C.D. Cal. Apr. 9, 2012) (granting a writ of coram nobis in an honest-services fraud conviction after that theory was invalidated in *Skilling*); *United States v. Lynch,* 807 F. Supp. 2d 224 (E.D. Pa. 2011) (same); *United States v. Panarella,* No. 00-cr-655, 2011 WL 3273599 (E.D. Pa. Aug. 1, 2011) (same).

wrong to stress that, considered generically, any given coram nobis petition has low odds of success. Seventy years ago, the Supreme Court pronounced that it was "difficult to conceive of a situation in a federal criminal case today where [a writ of *coram nobis*] would be necessary or appropriate." *United States v. Smith*, 331 U.S. 469, 475 n.4 (1947).[11]

It is easier to conceive of such a situation now. It is true that coram nobis relief is superfluous when the collateral consequences of a criminal conviction are limited or nonexistent. Immigration enforcement trends over the last decade have upped the ante, however. Deportations of aliens with prior criminal convictions, an enforcement priority under the prior presidential administration, have if anything increased under the present one.[12] And deportation is indisputably a serious, ongoing collateral consequence of a prior criminal conviction. To the extent that such collateral consequences have burgeoned, the necessity of coram nobis relief has grown correspondingly.

To obtain coram nobis relief, a petitioner must show that **(1)** he or she is no longer in custody, but "is suffering from continuing consequences of the allegedly invalid conviction"; **(2)** there was an error of a most fundamental kind for which "there was no remedy available at the time of trial";[13] and **(3)** "sound

---

[11]    The context of the *Smith* pronouncement was the writ's near-demise, followed by its revivification shortly thereafter in *Morgan, supra.* That sentence from *Smith* was quoted as recently as 1996, however, in *Carlisle v. United States*, 517 U.S. 416, 429 (1996).

[12]    *Compare* Report, Fiscal Year 2016 ICE Immigration Removals, *https://www.ice.gov/removal-statistics/2016 with*

Fiscal Year 2017 ICE Enforcement and Removal Operations Report, *https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf.*

[13]    The parties do not address the Third Circuit's statement that there must have been "no remedy available [for the fundamental error] *at the time of trial.*" *Babalola*, 248 F. App'x at 412 (emphasis added). *United States v. Morgan*, which the Third Circuit cites for this proposition, does not directly state this as a requirement, and seems to have meant something narrower. *See* 346 U.S. at 511-12 (suggesting that "deliberate failure to use a known remedy at the time of trial may be a bar to subsequent reliance on the defaulted right" and that when "no other remedy being then available and sound reasons existing for failure to seek appropriate earlier relief,

reasons exist for failing to seek relief earlier." *United States v. Babalola*, 248 F. App'x 409, 412 (3d Cir. 2007) (citations and internal quotation marks omitted).

In assessing likelihood of success on the merits of this coram nobis petition, I consider those three elements:

**(1)** Mr. Ragbir is no longer in custody, but surely does suffer from the continuing consequences of his allegedly invalid conviction. His order for deportation is explicitly based on the prior conviction. He thus satisfies the first requirement for coram nobis relief.

**(2)** Mr. Ragbir argues that there were several fundamental errors at his trial. Now is not the time to settle the merits of Mr. Ragbir's coram nobis petition. Rather, I must consider whether Mr. Ragbir has presented colorable arguments that demonstrate a sufficient likelihood of obtaining relief. At this stage, his petition focuses on **(a)** whether he was prejudiced by allegedly substandard advice of counsel, **(b)** whether the jury instructions on willful

---

this motion in the nature of the extraordinary writ of coram nobis must be heard by the federal trial court"). Other circuits have not treated it as a required element. *See, e.g.*, *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987) (articulating the standard for coram nobis relief: "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character"); *United States v. Akinsade*, 686 F.3d 248, 252 (4th Cir. 2012) (same). The Supreme Court in *United States v. Denedo* clarified that the "modern iteration" of coram nobis is "broader than its common-law predecessor." 556 U.S. 904, 911 (2009). *Denedo* did not limit the reach of coram nobis to cases in which there was "no remedy available at the time of trial"; rather, *Denedo* limited the writ to "extraordinary" cases for which there (currently) exist no alternative remedies. *Id.*

Ineffective assistance might be one reason to find that a remedy was unavailable to the defendant at the time of trial. And coram nobis is an appropriate vehicle for claims of ineffective assistance. *Id.* (citing *Morgan*, 364 U.S. at 513). Challenges to jury instructions may likewise come within the writ if the person was charged and convicted for something that is not a crime, which surely would qualify as a "fundamental" error. *See United States v. Stoneman*, 870 F.2d 102, 105-06 (3d Cir. 1989); *United States v. Panarella*, No. 00-cr-655, 2011 WL 3273599 (E.D. Pa. Aug. 1, 2011). I therefore conclude, at least preliminarily, that Mr. Ragbir's coram nobis petition is not barred by the language in *Babalola*.

blindness were in error, and **(c)** whether he was convicted on a now-rejected theory of honest-services fraud.

    **(a)** First, Mr. Ragbir has asserted a colorable claim regarding ineffective assistance of counsel.

> While ineffective assistance of counsel may constitute the kind of fundamental defect in a conviction required to obtain a writ of error coram nobis, *see United States v. Rad-O-Lite of Phila., Inc.*, 612 F.2d 740, 744 (3d Cir. 1979), in order to succeed the appellant must show both "(1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *See Carpenter v. Vaughn*, 296 F.3d 138, 149 (3d Cir. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)).

*United States v. Ntreh*, 639 F. App'x 63, 65 (3d Cir. 2016). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. at 689.

    Since 2010, defense counsel have had a duty to communicate clear deportation consequences of a conviction or sentence:

> Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward ... , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear ... the duty to give correct advice is equally clear.

*Padilla v. Kentucky*, 559 U.S. 356, 369 (2010) (footnote omitted). *Padilla,* however, announced a "new rule" that is not retroactive. *Chaidez v. United States*, 568 U.S. 342, 358 (2013). "[D]efendants whose convictions became final

prior to *Padilla* . . . cannot benefit from its holding." *Id.* (citing *Teague v. Lane*, 489 U.S. 288 (1989)). *Padilla*, decided in 2010, therefore casts no doubt on Mr. Ragbir's 2000 conviction.

Even before *Padilla*, however, counsel had a duty not to steer their clients wrong on immigration matters. *See Kovacs v. United States*, 744 F.3d 44, 49-51 (2d Cir. 2014). That is simply an instance of the "age-old principle that a lawyer may not affirmatively mislead a client." *Chaidez*, 568 U.S. at 367 (Sotomayor, J., dissenting). For instance, in *United States v. Khalaf*, the District of Massachusetts found that counsel's "failure to read the statute and articulate the proper meaning to Petitioner" constituted deficient performance where "a plain reading of the statute ... should have [made counsel] aware" of information that was material to immigration consequences. 116 F. Supp. 2d 210, 215 (D. Mass. 1999); *see also Sasonov v. United States*, 575 F. Supp. 2d 626 (D.N.J. 2008) (finding that attorney's affirmative misrepresentation of possible deportation consequences was objectively unreasonable); *State v. Nuñez-Valdéz*, 975 A.2d 418, 425-26 (2009) (holding that affirmative immigration misadvice constitutes ineffective assistance of counsel).

A federal statute clearly states how Mr. Rabgir's conviction and sentence would affect his immigration status. An alien is deportable if found guilty of an aggravated felony. 8 U.S.C. §§ 1227–28. An aggravated felony includes "an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(i). Mr. Ragbir alleges that his counsel failed to advise him that the calculation of dollar loss in connection with his sentencing (*i.e.,* whether it exceeded $10,000) would affect his deportability. (Pet'n ¶ 50). Indeed, he says, counsel advised him to waive a hearing as to the amount of loss, which the PSR calculated as exceeding $300,000. Mr. Rabgir was left with the mistaken impression that his deportation was a foregone conclusion once he was convicted. Had he been advised of the significance of the loss amount, says Mr. Ragbir, he would have exercised his right to a factual hearing on the question of loss. (Pet'n ¶ 51).

Alternatively, he might have negotiated a stipulation that distinguished between dollar losses attributable to indicted and unindicted conduct. (Pet'n ¶ 52). Mr. Ragbir alleges that the eight loans actually encompassed by his conviction did not cause a loss greater than $10,000. (Pet'n ¶¶ 51-52). If that is true, Mr. Ragbir would not have been labeled an "aggravated felon" and would not be subject to mandatory deportation. He thus makes a valid argument that, absent this misadvice, there would have been a different outcome.

**(b)** Mr. Ragbir also states a colorable argument that the jury instructions on willful blindness were in error. The jury was instructed that the knowledge requirement of the offense could be established "if you find that defendant was aware of the high probability of the existence of that fact and failed to take action to determine whether or not it is true." (Pet'n Ex. N). They were also instructed to find willful blindness "if there was a high probably that the defendant himself knew something was amiss and that he acted with deliberate disregard for a high probability that illegal activity was occurring." (Pet'n Ex. N).

Mr. Ragbir argues that this jury instruction conflicts with the requirements for willful blindness delineated in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011). *Global-Tech* provides that willful blindness has two basic requirements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 769. *Global-Tech* clarified that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 769-70. It is not enough to be a reckless defendant "who merely knows of a substantial and unjustified risk of such wrongdoing" or a negligent defendant "who should have known of a similar risk but, in fact, did not." *Id.* at 770. *Global-Tech* found that jury instructions demanding only "deliberate indifference" to a "known risk" are improper because they do not require "active efforts ... to avoid knowing." *Id.*

Mr. Ragbir has thus shown that the jury instructions on willful blindness may have been improper.

An error in jury instructions typically does not come within the writ of coram nobis. *See United States v. Stoneman*, 870 F.2d 102, 106 (3d Cir. 1989). However, "[t]hose substantive errors which result in a person's charge and conviction for something not a crime are fundamental" and can be corrected by the writ. *Id.* at 105. When a defendant is convicted and punished "for an act that the law does not make criminal[, t]here can be no room for doubt that such a circumstance 'inherently results in a complete miscarriage of justice' and 'present[s] exceptional circumstances' that justify collateral relief." *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346-47 (1974) (bracketed material in original)); *see United States v. Panarella*, No. 00-cr-655, 2011 WL 3273599, at *6 (E.D. Pa. Aug. 1, 2011). Mr. Ragbir has made a colorable argument that the jury was instructed to convict him if they found his actions negligent or reckless, whereas the criminal statute requires a higher scienter requirement. If this is true, he may have been convicted of something that is not criminal.

**(c)** Less persuasive is Mr. Ragbir's claim that he was convicted on a now-rejected theory of honest-services fraud. *See Skilling v. United States*, 561 U.S. 358 (2010). The honest-services theory of wire or mail fraud criminalizes the fraudulent deprivation of honest services, as opposed to money or property. *See* 18 U.S.C. § 1346 ("For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services").[14]

Most commonly, the theory is applied to cases of public corruption, such as bribery of an official to betray the public's trust:

---

[14]     To be clear: In 1987, the Supreme Court decided *McNally v. United States*, 483 U.S. 350 (1987), which overturned prior Court of Appeals case law and disallowed the honest services theory. Effective November 18, 1988, Congress enacted 18 U.S.C. § 1346, which restored the honest services theory. In 2000, Mr. Ragbir was convicted of wire fraud and conspiracy. In 2010, the Supreme Court decided *Skilling, supra,* which narrowed the § 1346 honest services theory.

For example, if a city mayor (the offender) accepted a bribe from a third party in exchange for awarding that party a city contract, yet the contract terms were the same as any that could have been negotiated at arm's length, the city (the betrayed party) would suffer no tangible loss. Even if the scheme occasioned a money or property *gain* for the betrayed party, ... actionable harm lay in the denial of that party's right to the offender's "honest services."

*Skilling*, 561 U.S. at 400 (internal citation omitted); *see United States v. Dixon*, 536 F.2d 1388, 1400 (2d Cir. 1976). However, courts have also recognized private-sector honest-services fraud:

When one tampers with [the employer-employee] relationship for the purpose of causing the employee to breach his duty [to his employer,] he is in effect defrauding the employer of a lawful right. The actual deception that is practised is the continued representation of the employee to the employer that he is honest and loyal to the employer's interests.

*Id.* (citing *United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942)).

The Supreme Court held in *Skilling v. United States* that 18 U.S.C. § 1346, which explicitly criminalizes deprivation of honest services, is limited to bribery and kickback schemes. 561 U.S. at 408-09. Coram nobis relief has been granted based on the *Skilling* decision. *See, e.g., United States v. Chartock*, No. 5-cr-414-2, 2013 WL 3009719 (E.D. Pa. June 18, 2013), *aff'd* 556 F. App'x 158 (3d Cir. 2014) (granting coram nobis relief on honest-services fraud counts where the jury had not found that the defendant received bribes or kickbacks).

Mr. Ragbir alleges that he, too, should be able to seek coram nobis relief per *Skilling*. The problem with his argument may lie in the premise: that he was convicted on an honest services theory.

First, the Government notes, Mr. Ragbir was convicted of defrauding his employer of money, not of honest services. The indictment does not specifically cite 18 U.S.C. § 1346. It does, however, charge a scheme and artifice to defraud, which under the definitional language of section 1346 could include a scheme to deprive of honest services. Ragbir points to jury instructions that

directed the jury to find a "scheme or artifice to defraud" if the defendant's actions departed "from fundamental honesty, moral uprightness, or fair play and candid dealings." (Pet'n ¶ 41; Pet'n Ex. N). That, however, might be charged in virtually any mail or wire fraud case, including a strictly monetary one. The "honest services" theory really zeroes in on the *object* of the dishonest scheme; it clarifies that the object of the deprivation may be, not only a victim's money, but the victim's intangible right to receive honest services from the defendant.[15] Mr. Ragbir does not asset that the jury was so instructed. He may be able to demonstrate that he was convicted on an honest-services theory, but preliminarily at least I am not persuaded.

Second, the Government argues that an honest-services fraud case must involve *solely* the loss of honest services. I agree that a proven deprivation of money would pose an obstacle (it might raise a harmless-error issue, if nothing else). I do not think, however, that it would rule out a coram nobis challenge as a matter of law. Courts have recognized that honest-services fraud cases can involve economic harm as well. *See United States v. Nayak*, 769 F.3d 978, 982 (7th Cir. 2014); *United States v. Milovanovic*, 678 F.3d 713, 726 (9th Cir. 2012); *United States v. Rybicki*, 354 F.3d 124, 146 (2d Cir. 2003) (en banc). And if, for example, a general verdict incorporated a valid wire fraud theory and an invalid honest services theory so intertwined that they could not be separated, relief might be appropriate. *See United States v. Murphy,* 323 F.3d 102 (3d Cir. 2002) (direct appeal).

Third, the Government claims that the monetary commission Mr. Ragbir received for processing the loans constituted a kind of bribe or kickback that would satisfy *Skilling*. Mr. Ragbir demurs, stating that he did not receive any

---

[15]     *United States v. Redzic*, 627 F.3d 683 (8th Cir. 2010), is not to the contrary. That was a post-conviction challenge to the "constructive amendment" of an indictment, complicated by a Supreme Court remand for reconsideration in light of the intervening *Skilling* case. The Court of Appeals held that the indictment sufficiently, if not explicitly, alleged deprivation of honest services in that a scheme to cheat on tests for commercial driver's licenses was alleged to involve corruption of a state official.

financial benefit from the fraudulent-loan applicant and was not working for
the applicant; he was compensated for the fraudulent loans on the same basis
that he was compensated for any other loan.

Mr. Ragbir's argument regarding *Skilling,* as I have intimated, faces some
hurdles. He has, however, presented two more promising arguments, and as to
them I find a sufficient likelihood of success to merit a stay so they can be
adjudicated fairly.

**(3)** Mr. Ragbir states that he sought relief early on, and that he has
"sound reasons" for not seeking relief before. Mr. Ragbir first challenged his
removability beginning in May 2006, when he was first served with a Notice to
Appear in Immigration Court. (Castle Cert. ¶¶ 8-10, 14-19). The BIA ultimately
denied Mr. Ragbir's motion in May 2012. At that time, the BIA stated that
Ragbir's legal claims were "properly the subject for a post-conviction motion to
the federal criminal court, and not for a motion to [the BIA] or on remand to
the Immigration Judge." (Pet'n Ex. K). Ragbir promptly filed such a post-
conviction motion, *i.e.,* a coram nobis petition in this Court, some six months
later, on November 30, 2012. (12-cv-7380 (ECF No. 1)). That is within the
realm of reasonableness. For example, in *Kovacs v. United States* the Second
Circuit found that a petitioner, who pled guilty to crimes in 1999 and did not
file a coram nobis petition until 2012, had filed a timely petition because he
had diligently pursued relief from the date his removal and filed a writ of coram
nobis when he learned about the availability of the writ. 744 F.3d 44, 54 (2d
Cir. 2014).

Mr. Ragbir has a stronger argument than the petitioner in *Kovacs.* He
diligently pursued relief from his removal order, challenging the underlying
aggravated felony in immigration proceedings. The BIA ruled on May 15, 2012,
for example, that "[t]he issues involving *Skilling v. United States, supra,* and the
respondent's convictions are properly the subject for a post-conviction motion
to the federal criminal court, and not for a motion to this Board or on remand
to the Immigration Judge." (ECF no. 1-1 at 77). On November 30, 2012,

without waiting for action on his Second Circuit Appeal, he filed his petition for a writ of coram nobis. (12cv380, ECF No. 1). This action, then, is not a come-lately assertion of rights, but rather the culmination of a series of actions challenging his conviction in the context of removal.

The delay after 2012 I find excusable. The original petition was administratively terminated without prejudice on May 30, 2013 in light of settlement discussions between Mr. Ragbir and the Government. (Castle Cert. ¶ 20). A subsequent petition was dismissed without prejudice with the government's consent, to permit Mr. Ragbir to pursue an application for presidential pardon. (Castle Cert. ¶ 22). When that pardon application apparently lapsed without action, the coram nobis petition was refiled in its current form.

Ultimately, Mr. Ragbir has shown a sufficient likelihood of success on the merits of his coram nobis petition. I express no position on whether the writ will be granted, and do not prejudge it. The probability of success, however, is sufficient to merit a stay.

### ii. Irreparable Injury Absent Stay

The applicant must also "demonstrate that irreparable injury is *likely* [not merely possible] in the absence of [a] [stay]." *In re Revel AC, Inc.*, 802 F.3d at 569 (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (bracketed material in original)). For irreparable injury, "we understand the Supreme Court's use of 'likely' to mean more apt to occur than not." *Id.*

Irreparable injury is easily found. "To banish [an immigrant] from home, family, and adopted country is punishment of the most drastic kind," *Lehmann v. United States*, 353 U.S. 685, 691 (1957) (Black, J., concurring), and "[w]e have long recognized that deportation is a particularly severe 'penalty.'" *Padilla v. Kentucky*, 559 U.S. 356 (2010). If deported, Mr. Ragbir would be separated from his wife, daughter, family, and community. His ability to meaningfully participate in this case would be impaired severely. Certainly, I have heard no commitment from the government that they would parole him into the United

31

States to attend any hearings that may be required to adjudicate this petition, let alone any retrial or resentencing should the petition be successful. Indeed, even if Mr. Ragbir's conviction were to be found erroneous and vacated (or transmuted into a non-aggravated felony), there is no guarantee that he would be permitted to adjust his status.

Likelihood of injury is not really a disputed issue. The government has been aggressive in its efforts to schedule removal. It does not dispute that without a stay, Mr. Ragbir will certainly be deported, and soon. True, he is subject to a temporary stay as a result of another action he recently filed in New York. That stay, however, may expire as early as March 26, 2018.[16]

The risk of irreparable injury thus weighs in favor of granting the stay.

### iii. Injury to Other Parties

"Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken*, 556 U.S. at 435. In the Third Circuit, "[w]e weigh the likelihood of harm to the movant (absent a stay) (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three)." *In re Revel AC, Inc.*, 802 F.3d at 569. It is true that "[t]here is always a public interest in prompt execution of removal orders." *Nken*, 556 U.S. at 436. However, the Government granted Mr. Ragbir a stay of removal in December 2011 and renewed this stay in February 2013, March 2014, and January 2016. (Castle Decl ¶ 17; Pet'n Ex. 1). There is not a strong showing that Mr. Ragbir's immediate deportation is necessary. He is not "particularly dangerous"; the underlying conviction, eighteen years old, is for a financial offense, and Mr. Ragbir has had no further brushes with the law. *See Nken*, 556 U.S. at 436. Nor has Ragbir "substantially prolonged his stay by abusing the processes provided to him." *See Nken*, 556 U.S. at 436. ICE has recognized

---

16     Of course each court must judge for itself; for each judge to find no likelihood of injury because another could grant a stay would result in a collective-action stalemate, and a result perhaps intended by neither.

as much through its grant of administrative stays. (Pet'n Ex. I). Therefore, while the Government surely has an interest in removing Mr. Ragbir, this interest does not overcome the irreparable injury to Mr. Ragbir absent a stay, or justify denial of a short stay *pendente lite*.

### iv. Public Interest

"We also take into account where the public interest lies (factor four)—in effect, how a stay decision has 'consequences beyond the immediate parties.'" *In re Revel AC, Inc.*, 802 F.3d at 569 (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 388 (7th Cir. 1984)). The Government, to be sure, is implementing a public policy in favor of removal. No significant harm will result, however, from waiting to ensure that removal is proper. If it is proper, it will occur in due course, and nothing will have been lost but a little more time. If not, then significant harm to the public interest will have occurred in the interim, in the form of a wrongful government action. The public always has an interest in assuring that criminal convictions rest on a proper basis.

Therefore, I find that the public interest, on balance, lies in favor of granting a stay.

Overall, consideration of the four traditional stay principles demonstrates that a stay of removal is appropriate in this particular instance. This is a rare circumstance where an individual has shown a probability of success on a coram nobis petition, there is a strong risk of irreparable injury that is not outweighed by the government's interest in removal, and the public interest lies in favor of granting a stay. I will therefore grant Mr. Ragbir a stay of removal while this court considers his coram nobis petition.

### III.  CONCLUSION

For the foregoing reasons, I find that this court possesses jurisdiction to consider a stay *pendente lite*. Considering the four pertinent factors, I find such a stay of removal to be appropriate while Mr. Ragbir's coram nobis petition is pending in this court.

The coram nobis petition will be scheduled for a prompt hearing on the merits within 30 days. On or before March 29, 2018, counsel will arrange a conference call with the court to schedule the hearing and make whatever pre-hearing arrangements are necessary.

Dated: March 23, 2018

**KEVIN MCNULTY**
**United States District Judge**