**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| RAVIDATH RAGBIR, | : | |
| Petitioner, | : | Civ. No. 17-1256 (KM) |
| v. | : | |
| UNITED STATES OF AMERICA, | : | OPINION |
| Respondent. | : | |

<u>KEVIN MCNULTY, U.S.D.J.</u>

## I.    INTRODUCTION

The petitioner, Ravidath Ragbir, is proceeding by counsel with a petition for a writ of error *coram nobis* under the All Writs Act, 28 U.S.C. § 1651. (Pet., DE 1.)[1] On May 4, 2018, the Court held an evidentiary hearing on the merits of the petition. (*See* DE 51, 52.) Following that hearing, the Court received supplemental briefing from the parties. (DE 60, 68, 74.) For the following reasons, the petition is denied.

What is driving this petition is an order that Mr. Ragbir be removed from the United States based on his 2000 conviction for conspiracy and mail fraud, determined by an immigration judge to be an aggravated felony. To all appearances, he has lived a law-abiding, even admirable, life since that time. I doubt that he poses a danger to this country or anyone in it. Arguments directed to the exercise of the immigration authorities' discretion, however, have been addressed by other courts in other proceedings. While at times expressing discomfort, those courts have thus far upheld the legality of the order of removal. The only issue before me is a challenge, by petition for a writ of *coram nobis,* to the underlying criminal conviction in this District. In an

---

[1]    "DE __" is a citation to docket entries in this matter, Civ. No. 17-256. Citations to docket entries in other cases are prefaced by the civil or criminal number.

earlier opinion granting a stay *pendente lite*, I observed that I might have lacked the power to stay removal pending review of an immigration decision, but that I did retain the inherent power to do so in connection with this *coram nobis* motion, which is a phase of a criminal case. Consistency constrains me to treat this petition like any other and view it on its criminal-law merits, as a post-custody challenge to a federal conviction.

## II.    BACKGROUND FACTS AND PROCEDURAL HISTORY

### A. D.N.J. Felony Conviction

Mr. Ragbir, a citizen of Trinidad and Tobago, became a lawful permanent resident of the United States in 1994. (DE 1 ¶¶ 1, 6; DE 1-1, Ex. B.) In the late 1990s, while working in a sales position at Household Finance Corporation ("HFC"), a mortgage lender, Mr. Ragbir accepted and processed loan applications submitted by a real-estate broker going by the name of Robert Taylor. (DE 1 ¶ 11.) "Taylor" was actually named Robert Kosch, and the mortgage applications he submitted were fraudulent. (DE 1 ¶ 12.)

Together with Kosch, Mr. Ragbir was charged in this District with one count of conspiracy to commit wire fraud, under 18 U.S.C. § 371, and six counts of wire fraud, under 18 U.S.C. § 1343. (*See United States v. Kosch*, Crim. No. 00-121 (WGB), Superseding Indictment, DE 18.) The case was assigned to then-District Judge William G. Bassler.[2]

The superseding indictment alleged that Kosch hired persons to pose as loan applicants and submit fraudulent applications to HFC. Mr. Ragbir allegedly accepted and preliminarily approved those fraudulent applications at HFC's West Orange office, where he worked. *See id.* Six such applications were forwarded from the West Orange office to HFC's Illinois office, resulting in total disbursements by HFC of over $400,000. *Id.*

Mr. Ragbir was represented during the criminal proceeding by Patricia A. Lee, Esq., from the Law Offices of Alan L. Zegas. (*See* DE 1-1, Ex. E.) The case

---

[2]    Judge Bassler retired from the court in 2006.

was tried to a jury over a three-week period in November 2000.[3] At trial, the government introduced in evidence, among other things, a confession in the form of a transcription of Mr. Ragbir's statements to police. (DE 1-2, Ex. M, vol. 5 at 190 & vol. 11 at 114–15.) At the conclusion of the trial, the jury found Mr. Ragbir guilty of all counts. (Crim. No. 00-121, DE 62.)

Following the jury's verdict, Judge Bassler scheduled a hearing to determine the dollar amount of loss resulting from the crimes for the purpose of sentencing. (*See* DE 1 ¶¶ 19–21; DE 1-1, Ex. E.) Before the hearing occurred, however, the parties stipulated to the relevant dollar figure. They agreed that, as a result of the transactions described in the indictment plus other related but uncharged transactions, HFC had disbursed $831,788.01 and had suffered actual losses of between $350,000 and $500,000. (DE 1-1, Ex. E; DE 1-3, Ex. Q.) On September 12, 2001, Judge Bassler sentenced Mr. Ragbir to concurrent terms of 30 months' imprisonment, payment of $350,001 in restitution, and concurrent terms of 3 years' supervised release. (Crim. No. 00-121, DE 81, 82; *see also* DE 1-3, Exs. S, T; Resp't's Opp'n to Order to Show Cause, Ex. 2, DE 22-2.)

Mr. Ragbir filed a notice of appeal to the United States Court of Appeals for the Third Circuit. (DE 84.) Service of sentence was delayed while that direct appeal was pending. (DE 88.)

On direct appeal, Mr. Ragbir was represented by Anthony J. Fusco, Esq. (DE 1 ¶ 26.) Mr. Fusco asserted that the trial court should have excluded Mr. Ragbir's confession as involuntary; should have granted a motion for acquittal or a new trial based on insufficiency of the evidence; should not have admitted evidence of fraudulent loans not criminally charged against Mr. Ragbir; should have granted a mistrial following Mr. Kosch's mid-trial guilty plea; and should not have applied Sentencing Guidelines enhancements for more than minimal planning and abuse of a position of trust. (*See* DE 1-3 at 48, Ex. U.) The Third

---

[3]    Mr. Kosch initially went to trial with Mr. Ragbir, but mid-trial, on November 14, 2000, he entered a plea of guilty. (Crim. No. 00-121, DE 48). The trial continued with Ragbir alone as defendant.

Circuit considered these grounds but affirmed Mr. Ragbir's conviction and sentence. *United States v. Ragbir*, 38 F. App'x 788 (3d Cir. 2002). The United States Supreme Court denied a petition for a writ of *certiorari*. *Ragbir v. United States*, 537 U.S. 1089 (2002). After an unexplained delay, on January 26, 2004, Judge Bassler ordered that Mr. Ragbir be designated for service of his custodial sentence. (DE 111.)

### B. ICE-Related Proceedings

Mr. Ragbir completed the service of his sentence of imprisonment in 2006. Immediately afterward, the Department of Homeland Security commenced removal proceedings against him. (*See* DE 1-1, Ex. B.) On August 7, 2006, an immigration judge ordered Mr. Ragbir removed from the United States on the basis of his conviction of an aggravated felony. For these purposes, an aggravated felony was defined as a crime of fraud or deceit causing a loss exceeding $10,000. [4] (Resp't's Opp'n to Order to Show Cause, Ex. 1, DE 22-1.) The Board of Immigration Appeals ("BIA") affirmed the immigration judge's order. (Resp't's Opp'n to Order to Show Cause, Ex. 3, DE 22-3.) Thereafter, the Court of Appeals for the Second Circuit upheld the BIA's decision, *Ragbir v. Holder*, 389 F. App'x 80 (2d Cir. 2010), and the Supreme Court denied a petition for writ of *certiorari*, *Ragbir v. Holder*, 565 U.S. 816 (2011).

In 2012, Mr. Ragbir applied to the BIA to reconsider, reopen, and remand his immigration proceedings. His petition argued, among other things, that the Supreme Court's intervening decision in *Skilling v. United States*, 561 U.S. 358,

---

[4]      For purposes of removal, the definition of an aggravated felony includes "an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000." 8 U.S.C. § 1101(a)(43)(M)(i). It also includes "an attempt or conspiracy to commit an offense described in this paragraph." 8 U.S.C. § 1101(a)(43)(U).

The finding, upheld on appeal, that the offense of conviction involved a loss exceeding $10,000 (*see* DE 22-1 at 5–8) was based on citations to the record of trial and sentencing. *See Ragbir v. Holder*, 389 F. App'x at 83–84 & n.6.

130 S. Ct. 2896 (2010), invalidated his conviction.[5] (*See* DE 1-1, Exs. C, K.) On May 15, 2012, the BIA denied this application, stating, *inter alia,* that "[t]he issues involving [*Skilling*] and the respondent's convictions are properly the subject for a post-conviction motion to the federal criminal court, and not for a motion to this Board or on remand to the Immigration Judge." (DE 1-1, Ex. K, at 2.) The Second Circuit denied Mr. Ragbir's petition to review that BIA decision. *Ragbir v. Lynch*, 640 F. App'x 105 (2d Cir. 2016).

On January 11, 2018, Mr. Ragbir was again taken into immigration custody on the basis that removal was imminent. (*See* DE 15 at 2.) Mr. Ragbir filed in the United States District Court for the Southern District of New York a petition for writ of habeas corpus under 28 U.S.C. § 2241 challenging the detention. *See Ragbir v. Sessions*, 18-cv-236 (KBF), 2018 WL 623557 (S.D.N.Y. Jan. 29, 2018). District Judge Katherine B. Forrest granted his petition and ordered his immediate release. *Id.* Mr. Ragbir also commenced a separate civil suit in the Southern District of New York, which primarily sought to enjoin his removal as a product of retaliation or discrimination based on his exercise of his First Amendment rights. *See Ragbir v. Homan*, 18-cv-1159 (PKC), 2018 WL 2338792 (S.D.N.Y. May 23, 2018). Finding that the court was deprived of subject-matter jurisdiction by 8 U.S.C. § 1252(g), District Judge P. Kevin Castel dismissed the claims for injunctive relief. *Id.* Mr. Ragbir's appeal of that dismissal remains pending before the Second Circuit, which has granted a stay of Mr. Ragbir's removal pending a decision on the merits. (*See* DE 80.) Mr. Ragbir's most recent order of removal has directed him to report on January 28, 2019. (D.E. 80.)[6]

---

[5]     Mr. Ragbir also unsuccessfully sought an adjustment of status based on his 2010 marriage to a U.S. citizen. (*See* DE 1-1, Ex. K.)

[6]     Mr. Ragbir resides in New York, so his immigration-related court proceedings took place there. The *coram nobis* petition, however, was brought in the District of New Jersey, the district of his criminal conviction.

### C. *Coram Nobis* Proceedings

Mr. Ragbir initially filed a *coram nobis* petition in this District in November 2012. Judge Bassler having retired in the interim, the matter was assigned to me. That *coram nobis* petition asserted that Judge Bassler's jury instructions were erroneous in light of subsequent Supreme Court authority, and that Ragbir had received ineffective assistance of counsel ("IAC"). (*Ragbir v. United States*, Civ. No. 12-7380 (KM), DE 1.)

As to the jury instructions, Mr. Ragbir focused on the trial judge's charge that the "knowledge" element of wire fraud could be satisfied if the defendant acted with "willful blindness." (*Id.* ¶¶ 41–45.) Mr. Ragbir argued that the Supreme Court had subsequently heightened the test for willful blindness in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S. Ct. 2060 (2011). Now, he said, willful blindness requires that the defendant subjectively believed there was a high probability of the fact in question and deliberately acted to avoid learning that fact, standards of which the jury, sitting in November 2000, was not made aware. *Id.* Mr. Ragbir also asserted, as he had before the BIA, that his conviction was based on a theory of honest-services fraud that was later repudiated by the Supreme Court in *Skilling v. United States*, 561 U.S. 358 (2010). (DE 1 ¶¶ 46–57.)

As to IAC, Mr. Ragbir asserted that his trial counsel failed to clearly explain to him that the dollar amount of loss attributed to his conviction could result in his removal from the United States. (*Id.* ¶¶ 58–65.) Ms. Lee, he said, had advised him to forgo a loss hearing and stipulate to a loss of between $350,000 and $500,000. That stipulation, he asserted, deprived him of the opportunity to present evidence that the actual loss fell below $10,000, the threshold for an "aggravated felony" that would render him deportable. (*Id.*; *see also* definition of aggravated felony, quoted at n.4, supra.)

In February 2013, at the parties' request, I stayed that original *coram nobis* proceeding for several months to facilitate settlement discussions. I later administratively terminated the matter without prejudice. (Civ. No. 12-7380,

DE 8–9, 11–12.) Two years later, the settlement having apparently fallen through, Mr. Ragbir reopened the proceeding and filed an amended *coram nobis* petition. The amended petition alleged that Ms. Lee's representation had been ineffective in two additional respects: she had failed to sufficiently investigate or negotiate the dollar amount of the loss, and she had failed to retain a linguistics expert to challenge the authenticity of the confession. (Civ. No. 12-7380, DE 18, ¶¶ 52–60.) The amended petition also added a claim of ineffective assistance of appellate counsel, Mr. Fusco. Fusco's representation allegedly fell short because he failed to appeal Judge Bassler's inclusion of the willful-blindness instruction. (*Id.* ¶¶ 61–63.) In March 2016, however, the parties voluntarily dismissed the *coram nobis* proceeding so that Mr. Ragbir could pursue a petition for a presidential pardon. (Civ. No. 12-7380, DE 29, 30.)

The pardon application lapsed without official action. Accordingly, in February 2017, Mr. Ragbir commenced this, the above-captioned *coram nobis* proceeding. This petition is essentially identical to the amended petition from the prior proceeding. (DE 1.) The government filed a response to Mr. Ragbir's petition in August 2017. (Opp'n, DE 9.) After receiving an extension of time to do so, Mr. Ragbir filed a reply brief in December 2017. (DE 14.)

By order to show cause, Mr. Ragbir sought an emergency stay of his removal, which was scheduled for January 2018. The government strongly opposed the stay and denied that the Court possessed the power to enter it. I accepted briefing from the parties and heard oral argument.[7] On March 23, 2018, I issued an Opinion (DE 40) and Order (DE 41) staying Mr. Ragbir's removal *pendente lite.*[8]

---

[7]    Actually, there were overlapping stay applications. In other proceedings in the Southern District of New York, *see* p.5, *supra*, Judge Castel stayed Mr. Ragbir's removal until March 14, 2018, a date subsequently extended. (DE 15, 16, 21, 37, 39.)

[8]    On May 21, 2018, the government appealed my ruling granting a stay to the United States Court of Appeals for the Third Circuit. (DE 53.) On November 15, 2018, the Court of Appeals ordered that appeal dismissed on consent. (DE 81.

On May 4, 2018, I held an evidentiary hearing on the merits of Mr. Ragbir's petition. (*See* DE 51–52.) Mr. Ragbir presented testimony from himself and from a linguistics expert, Dr. Robert Leonard; the government presented testimony from Mr. Ragbir's trial counsel, Ms. Lee. (*See* DE 52.) After various extensions requested and consented to by both sides, post-hearing briefing was completed in September 2018. (*See* DE 60, 68, 74.)

ICE has currently scheduled Mr. Ragbir's removal for January 28, 2019. (DE 80.)

## III. *CORAM NOBIS*: LEGAL STANDARD

*Coram nobis* was traditionally a common-law remedy for correcting factual errors. *United States v. Denedo*, 556 U.S. 904, 910, 129 S. Ct. 2213 (2009). In contemporary jurisprudence, it survives as a mechanism for the correction of "fundamental errors," used only in "'extraordinary' cases presenting circumstances compelling its use 'to achieve justice.'" *See id*. at 911 (quoting *United States v. Morgan*, 346 U.S. 502, 510–11, 74 S. Ct. 247 (1954)). Modern federal courts possess the authority to issue a writ of error *coram nobis* under the All Writs Act. 28 U.S.C. § 1651(a); *see Denedo*, 556 U.S. at 911; *United States v. Stoneman*, 870 F.2d 102, 105 (3d Cir. 1989).

*Coram nobis* is now a residual and interstitial remedy. "When an alternative remedy is available, a writ of error coram nobis may not issue." *United States v. Rhines*, 640 F.3d 69, 71 (3d Cir. 2011). One such alternative remedy, of course, would be a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Section 2255 does not apply, however, to a defendant no longer in "custody." 28 U.S.C. § 2255(a) (granting remedy to "[a] prisoner in custody" on a federal conviction). *Coram nobis* remains available to fill that gap; it is "an extraordinary remedy that 'has traditionally been used to attack [federal] convictions with continuing consequences when the petitioner is no longer 'in custody' for purposes of 28 U.S.C. 2255.'" *Rhines*, 640 F.3d at 71 (quoting *United States v. Baptiste*, 223 F.3d 188, 189 (3d Cir. 2000)); *see Stoneman*, 870 F.3d at 105–06; *see also Chaidez v. United States*, 568 U.S.

342, 345 n.1 (2013) ("A petition for writ of *coram nobis* provides a way to collaterally attack a criminal conviction for a person . . . who is no longer 'in custody' and therefore cannot seek habeas relief under 28 U.S.C. § 2255 or § 2241.").

The court's jurisdiction to grant *coram nobis* relief is limited, and "the standard for obtaining it is more stringent than that applicable on direct appeal or in habeas corpus." *Rhines*, 640 F.3d at 71; *Stoneman*, 870 F.2d at 106. "The error must go to the jurisdiction of the trial court, thus rendering the trial itself invalid. An error which could be remedied by a new trial, such as an error in jury instructions, does not normally come within the writ." *Stoneman,* 870 F.2d at 106 (citing *United States v. Mayer*, 235 U.S. 55, 69, 35 S. Ct. 16, 19–20 (1914,) and *United States v. Gross*, 614 F.2d 365, 368 (3d Cir. 1980)). *See also Rhines*, 640 F.3d at 71 ("Rather, the error must be fundamental and 'go to the jurisdiction of the trial court, thus rendering the trial itself invalid.'"); *United States v. Babalola*, 248 F. App'x 409, 411–12 (3d Cir. 2007); *United States v. Cariola*, 323 F.2d 180, 187 (3d Cir. 1963). "[E]arlier proceedings are presumptively correct and the petitioner bears the burden to show otherwise." *Babalola*, 248 F. App'x at 412; *see also Morgan*, 346 U.S. at 512; *Cariola*, 323 F.2d at 184.

*Coram nobis* relief has three essential prerequisites. A petitioner must show that (1) he or she is no longer in custody, but "is suffering from continuing consequences of the allegedly invalid conviction," (2) there was an error of a most fundamental kind for which "there was no remedy available at the time of trial," and (3) "sound reasons exist for failing to seek relief earlier." *Babalola*, 248 F. App'x at 412; *see also Mendoza v. United States*, 690 F.3d 157, 159 (3d Cir. 2012); *United States v. Orocio*, 645 F.3d 630, 634 n.4 (3d Cir. 2011), *abrogated on other grounds by Chaidez*, 568 U.S. 342; *Stoneman*, 870 F.2d at 105–06.

The first requirement, post-custodial consequences of the conviction, is conceded,[9] and I therefore move directly to the second and third requirements. In Sections IV.A and B, I discuss Mr. Ragbir's substantive claims that his conviction was infected by fundamental error in the jury instructions, for which there was no available remedy at the time of trial. In Section IV.C, I discuss the third, timeliness factor in relation to those claims. Finally, in Section V, I separately discuss Mr. Ragbir's claims of ineffective assistance of counsel at trial and on direct appeal.

## IV.    JURY INSTRUCTIONS

### A. Jury Instruction Concerning "Willful Blindness"

Mr. Ragbir's first claim of fundamental error is that erroneous jury instructions concerning "willful blindness" permitted the jury to convict him for conduct that was not knowing and willful—and thus not criminal. (DE 1 ¶¶ 38–40; *see also* DE 60 at 25–26, 28.) Ten years after his conviction, the Supreme Court handed down its decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S. Ct. 2060 (2011). *Global-Tech,* Mr. Ragbir argues, now establishes that the jury instructions on the wire fraud counts could have permitted a jury to convict based on a defendant's recklessness or negligence, falling short of the *mens rea* required for a fraud conviction. (*Id.*)

The government responds that errors in jury instructions do not typically warrant *coram nobis* relief. (DE 9 at 20–21; *see* p. 8, *supra*.). Backing off its initial position (*see id.* at 21–22), the government now concedes that the

---

[9]    Mr. Ragbir long ago finished serving the terms of custody and supervised release imposed by Judge Bassler in 2001. The parties agree that, when he filed his *coram nobis* petitions, he was no longer in custody in connection with that conviction. As for "continuing consequences," the conviction of this aggravated felony is the very basis for the order that he be removed from this country. The government therefore concedes that Mr. Ragbir satisfies the first essential prerequisite for *coram nobis* relief. (*See* DE 9 at 12; DE 68 at 3–4.) A possible partial exception is the government's separate argument that there was no prejudice from the error in the willful blindness jury instruction, because they applied only to the substantive counts and left the conspiracy count intact. That argument could be seen as undermining the concession of collateral consequences to some degree. *See* note 18, *infra*.

phrases singled out by Mr. Ragbir were incorrect. (DE 68 at 10). Still, it argues, the instruction as a whole sufficiently conveyed the correct standard. (*Id.* at 10–11.) At any rate, says the government, *Global-Tech* was not such a break with prior law that Mr. Ragbir should be excused for having failed to object earlier. (DE 9 at 13–14, 19–20.) Finally, any error in the wire fraud instruction was allegedly not prejudicial, because Mr. Ragbir was also convicted of conspiracy, an offense which may itself (if it exceeds the $10,000 threshold) qualify as an aggravated felony. (*Id.* at 21–22.)

The government is correct that errors which could have been corrected by a new trial, such as faulty jury instructions, generally do not warrant *coram nobis* relief. *Rhines*, 640 F.3d at 71. Such a correctable error cannot be regarded as fundamental:

> An error in jury instructions is normally remedied by the grant of a new trial. Such a remedy is not appropriate for *coram nobis,* since Stoneman has already served his sentence and seeks only to have its collateral effects alleviated. The United States Court of Appeals for the Seventh Circuit has stated that '[a]n error in the jury instructions—when a valid conviction could have been had under different instructions . . . —is not the sort of fundamental defect that produces a complete miscarriage of justice.'

*United States v. Stoneman*, 870 F.2d at 108 (alteration and ellipsis in original) (quoting *United States v. Keane*, 852 F.2d 199, 205 (7th Cir. 1988)). *Stoneman* also stated, however, that "substantive errors which result in a person's charge and conviction for something not a crime are fundamental," and it did review of an allegedly erroneous jury instruction (while ultimately denying relief). *See* 870 F.2d at 105, 107–08. From these two aspects of *Stoneman* I take the lesson that a defect in jury instructions ordinarily does not merit *coram nobis* relief, but a court may nevertheless review the instructions to determine whether

such an error *resulted* in a fundamental defect, *i.e.,* a "charge and conviction" for something that is "not a crime."[10]

On the issue of willful blindness in connection with the substantive wire fraud counts only, Judge Bassler gave the jury a three-paragraph instruction:

> [1] To find defendant guilty under counts 2 through 7, which charge the substantive acts of wire fraud, you must be convinced beyond a reasonable doubt that he acted knowingly and willfully. Since you cannot look inside defendant's mind to determine his intent, you must infer his intent and knowledge from his actions and words at the time of the commission of the crime or from the surrounding facts and circumstances shown by the evidence. Unlike in count one -- which is the conspiracy charge, the element of knowledge for the substantive wire fraud charges embodied in counts two through seven may be satisfied by inferences from the proof that defendant deliberately closed his eyes to what otherwise would have been obvious to him. When knowledge of the existence of a particular fact is an element of the offense, such knowledge may be established if you find that defendant was aware of the high probability of the existence of that fact and **failed to take action to determine whether or not it is true**.

> [2] Defendant cannot be convicted for being stupid, negligent, or mistaken. More is required than that. Defendant's knowledge of a fact may be inferred from willful blindness to the existence of facts which indicate that there is a high probability that some forbidden or illegal activity is occurring. It is your function to determine whether or not defendant deliberately closed his eyes to the inferences or conclusions to be drawn from the evidence. You may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge. I caution you, however, that this instruction applies only to counts 2 through 7. It has no application to the conspiracy charge embodied in count one. Defendant's membership in a conspiracy cannot be established through willful blindness.

---

[10]    Scattered cases from other Circuits have granted *coram nobis* relief where defective jury instructions enabled conviction for acts not proscribed by the criminal law. *See, e.g., United States v. McClelland*, 941 F.2d 999, 1002–03 (9th Cir. 1991); *United States v. Mandel*, 862 F.2d 1067, 1074–75 (4th Cir. 1988)

[3] In short, if the evidence shows that defendant positively did not know, then he must be acquitted. If the evidence indicates that he was very stupid in the actions that he took, or ignorant, then he cannot be convicted. But, if the evidence shows that **there was a high probability that defendant himself knew something was amiss** and that he acted with deliberate disregard for a high probability that illegal activity was occurring, then you may find that defendant had the guilty knowledge which is required for conviction of the offenses charged in counts 2 through 7.

(DE 1-2, Ex. N at 70–71; emphasis and [bracketed] paragraph numbers added.)

In *Global-Tech*, the Supreme Court reviewed established case law and concluded that a willful-blindness theory incorporates two requirements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." 563 U.S. at 769.

As now conceded by the government, two phrases in the jury instruction (**highlighted** in the quotation, *supra*), at least taken in isolation, do not meet the *Global-Tech* standard:

First, it is not enough that there *have been* "a high probability that defendant himself knew" of some fact of consequence, as charged in the third paragraph. Rather, *Global-Tech* requires the government to prove that the defendant *subjectively believed* there was a high probability that the fact existed. *See id.*

Second, it is not enough to show that the defendant "failed to take action" to determine whether a given fact existed, as charged in the first paragraph. Rather, *Global-Tech* requires a defendant to have "take[n] *deliberate actions* to avoid learning of that fact," in order to avoid the danger of a conviction based on mere negligence. *See id.*

Despite the conceded flaws in the two highlighted phrases, the government contends that the instruction, taken as a whole, adequately describes the willful-blindness standard in terms consistent with *Global-Tech*.

It is true, of course, that jury instructions must be read as a whole.[11] It is also true, as the government says, that if the highlighted passages are set aside, other language in the instruction emphasizes deliberateness and repudiates the notion of a conviction based on negligence or recklessness. The objectionable phrases, however, undermine that other language in a way that could have misled or at least confused the jury.

For example, that a defendant "deliberately turned a blind eye" might have been a useful metaphorical elaboration of the underlying point that conscious avoidance is required. That underlying point itself, however, is not accurately expressed, and the jury may well have clung to the more concrete, and erroneous, instructions to which Ragbir objects. Similarly, phrases such as "deliberate avoidance" or "deliberate disregard" are more abstract and less vivid than the instruction that the defendant need only have "failed to take action." The "high probability" defect, moreover, occurs in the final, summing-up sentence, in which the trial judge succinctly specified the evidence required to reach a guilty verdict on a willful-blindness theory.

In an abundance of caution, then, I reject the notion that the willful-blindness instruction was correct overall. I do not say it was flat wrong—the correct principles could be gleaned from it—but it was still capable of leading a juror astray. On direct appeal, that would probably be sufficient to state a claim of error (setting aside the issues of prejudice and the likelihood that it would be reviewed only for plain error). That, however, is only the first hurdle.

I next consider whether the error was, as claimed, "fundamental" for purposes of *coram nobis* relief. *Stoneman, supra,* is a useful test case, because it reviewed a mail fraud conviction on the assumption that *any* honest services theory would have been erroneous (because the conduct charged as criminal occurred before Congress enacted 18 U.S.C. § 1346 to fill the honest services

---

[11]    *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S. Ct. 396 (1973) ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."); *see also Jones v. United States*, 527 U.S. 373, 391, 119 S. Ct. 2090 (1999); *Gov't of V.I. v. Rosa*, 399 F.3d 283, 296 (3d Cir. 2005).

gap left by *McNally*).[12] The Court of Appeals considered "whether an error in jury instructions under *McNally* is a *fundamental* error justifying vacation of a final conviction on collateral review by issuance of a writ of error *coram nobis*." 870 F.2d at 105. Because *McNally* went to the very statutory definition of the conduct proscribed by the offense, the Court found that a *McNally* error was fundamental. Depriving someone of the intangible right of honest services was (at that time) simply "not a crime":

> Those substantive errors which result in a person's charge and conviction for something not a crime are fundamental. In determining what is not a crime, authoritative Supreme Court cases are as much a part of the law as the statute itself. Hence, when the Supreme Court decided in *McNally* that the statute punished only persons who caused tangible loss to victims, that requirement became a part of the definition of the crime. A person charged in an indictment that did not include a loss of tangible rights or convicted by evidence that did not show a violation is punished for something not a crime and is entitled to collateral review. If a defendant were convicted and punished "for an act that the law does not make criminal[, t]here can be no room for doubt that such a circumstance 'inherently results in a complete miscarriage of justice' and 'present[s] exceptional circumstances' that justify collateral relief." *Davis v. United States,* 417 U.S. 333, 346-47, 94 S. Ct. 2298, 2305, 41 L.Ed.2d 109 (1974) (in *habeas corpus* proceeding, petitioner may assert change in the substantive law after his conviction).

*Stoneman,* 870 F.2d at 105.

It could be said, albeit hyperbolically, that any defendant whose jury instructions contained a substantial error was convicted of something that was "not a crime." In using that phrase, however, *Stoneman* meant something more limited and basic: To be convicted of something that was "not a crime" is to be convicted based on acts that *could not* have been criminal *even if* the jury instructions had been correct. Pre-1988, a *McNally* error was such a fundamental error. If a defendant had deprived an employer only of honest

---

[12]    *See* Section IV.B, *infra,* for a brief history of the honest-services theory of fraud.

services, but not money or property, that the conduct was not within the prohibition of the mail or wire fraud statutes. To instruct the jury correctly that a deprivation of money or property was required would have been to rule out a conviction as a matter of law. To look at it another way, a "fundamental" error is one that would have required outright reversal and dismissal of the charges on appeal, as opposed to one that could have been corrected by a remand for a new trial.

In short, "'an error in the jury instructions - when a valid conviction could have been had under different instructions ...- is not the sort of fundamental defect that produces a complete miscarriage of justice.'" *Stoneman*, 870 F.2d at 108 (quoting *United States v. Keane,* 852 F.2d 199, 205 (7th Cir. 1988)).

This error in the willful blindness instructions is of a kind routinely corrected on appeal by remand for a new trial, not by dismissal on the theory that the defendant was convicted of something that was "not a crime."[13] Ragbir's alleged conduct—submission of false loan applications to induce HFC to part with money—was criminal, and a "valid conviction could have been had under different [*i.e.,* correct money-fraud] instructions." *Stoneman,* 870 F.2d at 108. For purposes of *coram nobis* review, then, this error in the instructions was not "fundamental."

---

[13]    *See, e.g., United States v. Dobson*, 419 F.3d 231, 241 (3d Cir. 2005) (where jury instructions did not require a sufficient finding that the defendant participated in the fraudulent scheme with knowledge, the Court would "remand the matter for a new trial."); *United States v. Retos,* 25 F.3d 1220, 1232 (3d Cir. 1994) (reversing based on error in jury instructions regarding defendant's knowledge, and holding that the government "may, in its discretion, retry Retos on Count 4, inasmuch as our vacatur of Retos' structuring conviction did not result from a finding of insufficient evidence"). Indeed, even an instructional error as to the elements of an offense—which would surely entail a conviction for something "not a crime" in the hyperbolic sense discussed above—will ordinarily result in a remand for a retrial "before a properly instructed jury." *United States v. Fattah,* 2019 WL 209109, at *57 (3d Cir. Jan 16, 2019) (error in jury instructions that could have permitted conviction of bribery in return for something not properly considered an "official act" under 18 U.S.C. § 201(a)(3)). A retrial would not be proper, of course, for a reversal based on insufficiency of the evidence, which would trigger the defendant's right not to be retried under the double jeopardy clause of the Fifth Amendment.

I next consider whether the claimed error in the willful blindness instruction is one "for which there was no remedy available at the time of trial."[14] *See* Section III, *supra* (citing *Babalola*, 248 F. App'x at 412; *Mendoza*, 690 F.3d at 159; *Orocio*, 645 F.3d at 634 n.4; *Stoneman*, 870 F.2d at 106.).[15] On this point, Mr. Ragbir relies solely on the fact that *Global-Tech* had not yet been decided. (DE 60 at 34.) I do not accept, however, that this claim of error was unavailable when this case was tried in November 2000. Then as now, ample Third Circuit case law required a subjective awareness of a high probability of the facts, as well as deliberate steps to avoid such knowledge.

The premise of Mr. Ragbir's argument is that *Global-Tech*, decided in 2011, changed the legal requirements of a willful-blindness charge. He states that he "could not have brought his petition before 2012, because his claims were effectively[] foreclosed until the Supreme Court's decision[] in . . . *Global-Tech.*." (DE 14 at 13) *Global-Tech*, however, at most solidified a doctrine that

---

[14]    Ms. Lee argued that a willful-blindness instruction should not be delivered, but she did not argue that the language of the instruction was erroneous. Nor did counsel make such a contention on direct appeal, or indeed at any time thereafter, until Mr. Ragbir filed his *coram nobis* petition in 2012, over ten years later.

[15]    As discussed more thoroughly in my opinion granting Mr. Ragbir's stay *pendente lite*, the Supreme Court in *Morgan* may have implied, but did not explicitly state, a requirement that a remedy have been unavailable at the time of trial. (*See* DE 40 at 22 n. 13.) In the decades following *Morgan*, however, the Third Circuit has repeatedly held that *coram nobis* relief is appropriate only "to correct errors for which there was no remedy available at the time of trial." *E.g., Mendoza*, 690 F.3d at 159, and cases cited above. That precedent binds this trial-level court.

The precedents can perhaps be harmonized by treating this "unavailability" requirement as being inherent in the requirement that the error be fundamental (in the sense of not correctable by a new trial), or the requirement that "sound reasons exist for failing to seek relief earlier." *See* Section III, *supra*. The language of *Morgan* will bear that interpretation. *See* 346 U.S. at 511–12 (suggesting that "deliberate failure to use a known remedy at the time of trial may be a bar to subsequent reliance on the defaulted right" and that, on the other hand, "no other remedy being then available and sound reasons existing for failure to seek appropriate earlier relief," a *coram nobis* petition is appropriate). If an error could have been asserted at trial, then the "sound reasons" requirement is likely not met. And that, in turn, may be just an aspect of the principle that *coram nobis* proceedings embody a standard higher than, say, the ordinary plain error standard applicable to unpreserved claims on direct appeal. *See* Fed. R. Crim. P. 52(b).

was already well established in the case law. To say that defendant's current view of willful blindness was "foreclosed" by pre-*Global Tech* precedent is simply wrong.

*Global-Tech* was not itself a criminal case; it considered the issue of whether to extend the criminal-law doctrine of willful blindness to a civil lawsuit for induced patent infringement under 35 U.S.C. § 271(b). 563 U.S. at 768. As a foundation for its holding, the Court cited a century's worth of precedent, as well as the 1962 Model Penal Code, for the proposition that the essential elements of willful blindness were well settled. 563 U.S. at 766 ("The doctrine . . . is well established in criminal law."). *Global-Tech* did not promulgate its two-part test of willful blindness as a new, Supreme-Court-made doctrine. On the contrary, it presented that two-part test as settled law, distilled from its survey of the Courts of Appeals:

> While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.[9]

*Id.* at 569. That is the very passage that Ragbir now cites in support of his position. The footnote to that passage, *id.* n.9, cites supporting case law from ten Circuits, including the Third Circuit case of *United States v. Stadtmauer*, 620 F.3d 238, 257 (3d Cir. 2010).[16]

As to the first, "subjective awareness" requirement, *Stadtmauer* was quite explicit. It held that the willful blindness jury instruction it was reviewing "adhered to our precedent requiring that such an instruction 'make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability.'" 620 F.3d at 257 (emphasis added) (citing *United States v.*

---

[16]    The only arguable exception, wrote the court, was the D.C. Circuit. *See id.* at 569 & n. 9 (citing *United States v. Alston–Graves*, 435 F.3d 331, 339–41 (D.C. Cir. 2006)).

*Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000) (quoting *United States v. Caminos*, 770 F.2d 361, 365 (3d Cir. 1985))). *Stadtmauer,* to be sure, lay ten years in the future when Mr. Ragbir's criminal case was tried. But the precedent it cited in support dated from as long ago as 1985 (*Caminos*), and from as recently as September 18, 2000 (*Wert-Ruiz),* decided a mere two months before Judge Bassler charged the jury in the Ragbir case.[17]

---

[17]    Complicating the picture is another strand in the Third Circuit case law, not discussed in *Stadtmauer*. In a case post-dating Ragbir's trial but citing earlier authority, the Third Circuit seemed to undermine the requirement of a subjective standard:

> The only alleged shortcoming that [defendant] identifies in the instruction is that it omitted the requirement that "the defendant himself was subjectively aware of the high probability of the fact in question." . . . Yet our cases make clear that no such requirement exists. As we explained in *United States v. Stewart*, 185 F.3d 112 (3d Cir.1999), "we do not require a court's [willful blindness] charge to contain specific language that a defendant must have 'a subjective awareness of a high probability that something is amiss.' " *Id.* at 126 (quoting *United States v. Stuart*, 22 F.3d 76, 81 (3d Cir. 1994)).

*United States v. Titchell*, 261 F.3d 348, 351 (3d Cir. 2001).

The cited *Stewart* case, however, itself cited *Caminos,* and did not purport to depart from its holding. *Stewart* dealt with an omission, not a mistake; it held only that there was no requirement that a charge "contain specific language that a defendant must have 'a subjective awareness of a high probability that something is amiss.'" 185 F.3d at 126. It upheld the conviction because other language in the instructions was "sufficient to guard against the jury convicting [defendant] under an objective standard of willful blindness." *Id.* The *Stuart* case, cited in both *Stewart* and *Titchell,* also follows *Caminos* and holds that a charge that the defendant "deliberately" closed his eyes or ignored the obvious was sufficient. 22 F.3d at 81.

*Titchell's* statement that the charge should be upheld even though it "omitted *the requirement*" of subjective awareness should therefore not be read too broadly. *Titchell* was not saying that the test was an objective one. The jury charge in that case required that the defendant "acted with deliberate disregard" of the truth or with the "conscious purpose of avoiding learning the truth"; it cautioned that the defendant could not be convicted if he "actually believed the statement[s] to be true," or if he acted out of negligence or inadvertence. 261 F.3d at 351. Like the instructions in *Stewart* and *Stuart,* the *Titchell* instruction *omitted* "specific language," *e.g.,* the phrase "subjective awareness"; it did not state or imply, however, that a conviction could be properly based on an objective standard, and it held that the instruction as a whole safeguarded against that possibility.

*Titchell,* then, does not detract from my conclusion that Ragbir's current challenge to the willful blindness instruction (a) could have been brought at the time, based on the *Caminos* line of cases; (b) was not foreclosed by the

As to the second, "deliberate avoidance" requirement, Third Circuit case law was equally clear. By 1995 at the latest, the Third Circuit considered it settled that knowledge could be imputed where a defendant "deliberately avoided" learning a fact, but *not* where a defendant was "merely negligent or reckless in failing to realize the unlawfulness of his actions." *United States v. Hayden*, 64 F.3d 126, 133 & n.11 (3d Cir. 1995); *see also Wert-Ruiz*, 228 F.3d at 255.

I therefore reject any notion that the defendant was "foreclosed" from making his willful blindness argument until *Global-Tech* was decided in 2011. On the contrary, when Mr. Ragbir was tried, the elements of the two-part test of willful blindness were both well established in the case law. At the very least, a challenge on those grounds was readily "available," even if it did not yet have the unequivocal sanction of a Supreme Court holding.

In sum, the error in the willful blindness instructions was not a "fundamental," uncorrectable one, and the current challenge is not one that was foreclosed by pre-2011 precedent. For the foregoing reasons, I hold that the defect in the willful-blindness instruction on the wire fraud counts, even read in light of the later authority of *Global-Tech,* does not merit *coram nobis* relief.[18]

---

*Stewart/Stuart/Titchell* analysis, which likewise imposed a subjective standard; and (c) was not newly made available by *Global-Tech,* ten years later.

[18]    Although the grounds identified above are more than sufficient, it is also worth considering whether any error in the willful-blindness instruction was prejudicial, an argument stated but not pressed by the government. Here, the error in the wire fraud counts did not infect the conspiracy count of conviction, and that overarching conspiracy count may itself qualify as an aggravated felony. The immigration authorities, faced by a one-count overarching conspiracy conviction, would very likely have exercised their discretion in the same manner. Still, that conclusion would be speculative to some degree, and it is unnecessary to rely on it. For completeness, I discuss the issue briefly.

On habeas review, a court examining an alleged error in jury instructions must determine "whether the error had substantial and injurious effect or influence in determining the jury's verdict" which is the basis for the defendant's current custody. *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S. Ct. 992 (1995). On *coram nobis* review, the custody ship has already sailed. It therefore makes a certain amount of sense to

**B. Jury Instructions Regarding Scheme to Defraud**

Mr. Ragbir next asserts that Judge Bassler's jury instructions permitted the jury to convict him on a theory of honest-services wire fraud later found invalid in *Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896 (2010). In 2010, the Supreme Court's *Skilling* decision established that the "honest-services" theory of mail or wire fraud is confined to cases in which the defendant received bribes or kickbacks, which Mr. Ragbir did not. (DE 1 ¶¶ 41–45.) Particularly improper under *Skilling*, according to Mr. Ragbir, was the jury instruction that a "scheme or artifice to defraud" is one in which the

––––––––––––––––

assess prejudice not just in relation to the conviction, but in relation to the collateral consequence that the petitioner is suffering—here, removal from the United States.

The order of removal flows from Mr. Ragbir's conviction of an aggravated fraud felony involving a loss in excess of $10,000. The willful-blindness instruction error, however, applies only to the substantive wire fraud counts. As Judge Bassler carefully instructed the jury, the willful-blindness theory did not apply at all to Count 1, the overarching count of conspiracy to commit wire fraud. *See* Instruction, quoted at pp. 11–12, *supra* ("Unlike in count one -- which is the conspiracy charge, the element of knowledge for the substantive wire fraud charges embodied in counts two through seven may be satisfied by inferences from the proof that defendant deliberately closed his eyes to what otherwise would have been obvious to him.") The jury was instructed that the conspiracy count required actual knowledge, not willful blindness. (*See* DE 9-1 at 49, 50–51.) The jury must be presumed to have followed those instructions, *see Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702 (1987), when it found Mr. Ragbir guilty of the conspiracy count. The conspiracy count is thus uninfected by any error in the willful-blindness instruction.

The conspiracy offense of conviction is also eligible as an aggravated felony, and even standing alone, it would have rendered Mr. Ragbir deportable. *See* 8 U.S.C. § 1101(a)(43)(M)(i) (aggravated felony includes "an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000"; 8 U.S.C. § 1101(a)(43)(U) (aggravated felony also includes "an attempt or conspiracy to commit an offense described in this paragraph."). The loss figure of $350,000 was not confined to the substantive offenses in Counts 2–7. The Count 1 conspiracy encompasses the same conduct that is charged substantively in Counts 2 through 7, the wire frauds. The dollar loss attributable to the conspiracy, for purposes of sentencing, is at least as broad as that encompassed by the substantive wire fraud counts. *See* U.S.S.G. § 1B1.3 (for joint scheme, whether or not charged as a conspiracy, relevant conduct includes acts within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity, that occurred in preparation for, during, or in attempting to avoid detection).

defendant's actions represented a "departure from fundamental honesty, moral uprightness, or fair play and candid dealings." (*Id.*)

The government's response is straightforward. Because Mr. Ragbir was not convicted under an honest-services theory, *Skilling* has no relevance. (DE 9 at 23–26.)

For context, I briefly track the meandering course of the honest-services theory. The wire-fraud statute, under which Mr. Ragbir was convicted of Counts 2–7, reads as follows:

> Whoever, having devised or intending to devise *any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,* transmits or causes to be transmitted by means of wire . . . in interstate of foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [is guilty of an offense].

18 U.S.C. § 1343 (emphasis added). The language of the mail fraud statute is substantively parallel. *See* 18 U.S.C. § 1341; *Skilling*, 561 U.S. at 399. For these purposes, the bank-fraud statute is similar as well. *See* 18 U.S.C. § 1344.

Until 1987, there was widespread agreement that a "scheme or artifice to defraud" could include not only a scheme to deprive a victim of "money or property," as explicitly provided in the statute, but also one to deprive a victim of the intangible right to an official's honest services. *See Skilling*, 561 U.S. at 400. *See also United States v. Dixon*, 536 F.2d 1388 (2d Cir. 1976); *United States v. McNeive*, 536 F.2d 1245 (8th Cir. 1976); *Shushan v. United States*, 117 F.2d 110 (5th Cir. 1941). In 1987, however, the Supreme Court overturned this interpretation of the fraud statutes in *McNally v. United States*, 483 U.S. 350, 360, 107 S. Ct. 2875 (1987). The traditional concept of "fraud" embodied in the mail fraud statute, *McNally* held, was limited to violations of property rights and did not cover deprivations of the intangible right of honest services.

Congress moved quickly to restore the "honest services" theory. Effective November 18, 1988, it enacted 18 U.S.C. § 1346, which reads in its entirety as follows: "For the purposes of this chapter, the term 'scheme or artifice to

22

defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."[19]

Section 1346 was the statute that *Skilling* interpreted in 2010, a decade after Mr. Ragbir's conviction. The Supreme Court, to meet concerns of unconstitutional vagueness, preserved § 1346 honest-services liability but restricted its scope:

> In *Skilling,* the Supreme Court acknowledged "Congress intended § 1346 to refer to and incorporate the honest-services doctrine recognized in Courts of Appeals' decisions before *McNally* derailed the intangible-rights theory of fraud." *Id.* at 404, 130 S. Ct. 2896. But it also recognized a broad reading of the statute "would raise the due process concerns underlying the vagueness doctrine." *Id.* at 408, 130 S. Ct. 2896. In order to preserve the statute, the Court surveyed pre-*McNally* honest services case law, *see id.* 404–08, 130 S. Ct. 2896, and concluded "there is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks," *id.* at 408, 130 S. Ct. 2896. Accordingly, the Court limited the application of Section 1346 to "the bribe-and-kickback core of the pre-*McNally* case law." *Id.* at 409, 107 S. Ct. 2875.

*United States v. Baroni*, 909 F.3d 550, 568 (3d Cir. 2018). Thus *Skilling* held that § 1346-based liability was—and, as a matter of statutory interpretation, always had been—limited to situations in which the defendant, in return for breaching a duty to provide honest services, received a bribe or kickback. *See Skilling*, 561 U.S. at 404, 408–09.[20]

---

[19]    To be clear, these machinations preceded the criminal conduct in Ragbir's case. As a result of the enactment of 18 U.S.C. § 1346, effective November 18, 1988, the honest-services theory was thereafter available. *Skilling*'s final narrowing of that theory to bribery/kickback cases, however, came years after Mr. Ragbir's conviction. *See infra.*

[20]    The trajectory of the honest-services theory of mail fraud, then, may informally be summarized thus:

Until 1987: honest services not covered (although most thought it was)

1987–88: honest services not covered (as *McNally* now made clear)

1988–2010: honest services covered under § 1346, but only as to bribery/kickbacks (although that limitation was not yet authoritatively established)

An honest-services theory, whether valid or invalid under *Skilling*, must still be contrasted with the traditional fraud theory that the victim was deprived of "money or property." *See* 18 U.S.C. §§ 1341, 1343; *United States v. Wright*, 665 F.3d 560, 573 (3d Cir. 2012) ("Traditional mail fraud under § 1341 involves defrauding a party of money or property, whereas honest services fraud under § 1346 involves defrauding the public of an official's 'honest services.'"). *Skilling* restricted the law of honest-services fraud to cases of bribes or kickbacks, but "*Skilling* did not disturb the law of traditional fraud." *Id.* at 573. For a traditional monetary fraud, neither *Skilling* nor any other authority requires a showing of bribes or kickbacks. A false statement or scheme to induce a victim to part with money or property falls squarely within the traditional conception of fraud. It does not raise the vagueness concerns that produced the *Skilling* holding.

For *Skilling* to make any difference in this case, then, Mr. Ragbir would need to have been convicted based on an honest-services theory. He was not.

The criminal charges against Mr. Ragbir explicitly alleged that he had deprived HFC of money, not the intangible right to honest services. The indictment alleged that the conspiracy had caused HFC to disburse more than $400,000. Each count of wire fraud was expressly linked to a specific transaction in which HFC received a fraudulent loan application processed by Mr. Ragbir and, based on that application, disbursed loan funds. The words "honest services" do not appear in the indictment.

The prosecution, at the outset of its opening statement to the jury, characterized the offense as a fraud with the objective of depriving HFC of

---

2010–present: honest services covered under § 1346, but only as to bribery/kickbacks (as *Skilling* now made clear)

*Skilling*'s constriction of honest-services fraud has inspired the filing of a number of *coram nobis* petitions. *See, e.g.*, *United States v. Biondi*, 600 F. App'x 45 (3d Cir. 2015) (denied for failure to demonstrate ongoing consequences of mail fraud conviction that would have been invalid under *Skilling*); *United States v. Chartock*, 556 F. App'x 158 (3d Cir. 2014) (denied because, despite invalidity of one honest services theory, there was sufficient evidence to sustain the conviction on a second, valid "bribery" theory).

money: "This is a fraud case. It's a case about two individuals and stolen identities, aliases and false information to cheat a mortgage company out of $400,000." (DE 1-2, Ex. M, at 3). And later, "the issue really boils down to this: Did Kosch and Ragbir intentionally use false information to deceive Household Finance and obtain loans? . . . . Household Finance cut checks . . . relying on the fraudulent information put into the applications by Mr. Ragbir.  Household Finance did not detect the fraudulent nature of those loans, as the evidence will show, until after all the checks were cut."  (DE 1-2, Ex. M at 18).

Finally, and most important, the jury instructions in Mr. Ragbir's case do not use the words "honest services." Nor do they state or imply that he could be convicted based on a deprivation of the intangible right to honest services.

Here is Judge Bassler's instruction to the jury defining a scheme or artifice to defraud:

> The words "scheme" and "artifice" include any plan, device or course of action by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value.
>
> A "scheme to defraud" is not defined according to any technical standards and need not be fraudulent on its face. It must, however, involve some sort of fraudulent misrepresentations or omissions, that is, deliberate failures to disclose information on facts, reasonably calculated to deceive persons of ordinary prudence and comprehension.
>
> A scheme or artifice to defraud may be found where there has been a departure from fundamental honesty, moral uprightness, or fair play and candid dealings.
>
> The scheme to defraud as charged is made up of various acts. It is not necessary for the United States to prove all of them, as long as sufficient evidence is shown to establish that the scheme, substantially as charged, was set up.

(DE 1-2, Ex. N at 38–39.)

To be sure, as Mr. Ragbir points out, the definition of a "scheme or artifice to defraud" refers in general terms to dishonesty—a "departure from

fundamental honesty, moral uprightness, or fair play and candid dealings."
(*See* DE 60 at 30.) The same could be said, however, of virtually any mail or
wire fraud scheme, including a strictly monetary one. Inclusion of such general
"dishonesty" language, then, does not imply that the case was brought on an
honest-services theory.[21] Now to defraud someone of money is, of course, a
dishonest act. The "honest services" theory, however, is about something else—

---

[21]    Mr. Ragbir concedes that many courts have upheld convictions where the jury
charge included this "dishonesty" language. (*See* DE 74 at 20.) At least in this Circuit,
delivery of such a charge has not resulted in the reversal of a criminal conviction.
More to the point, no case holds or suggests that inclusion of such language in the
charge converts a money-fraud case into one for deprivation of the intangible right to
honest services.

   *United States v. Goldblatt*, 813 F.2d 619 (3d Cir. 1987), approved delivery of
such a "dishonesty" instruction in a bank fraud case. Contrary to Mr. Ragbir's
argument, however, *Goldblatt* does not link this instruction to an honest-services
theory (which, in that pre-*McNally* era, would have been considered valid). The fraud
in that case was "a scheme or artifice to defraud a federally insured financial
institution *of money*." *Id.* at 623 (emphasis added). The defendant was not a bank
employee who owed the bank a duty of honest services. He was a depositor, who (*inter
alia*) made a fraudulent claim of unauthorized use of his ATM card, netting him $900.

   In *United States v. Dobson*, 419 F.3d 231, 239 (3d Cir. 2005), a mail fraud case,
the Court of Appeals held that the trial court had erroneously failed to instruct the
jury as to the requirement of "culpable," *i.e.*, knowledgeable, participation in the
scheme. The court observed that the "departure from fundamental honesty" language,
although "correct as given," did not remedy and may even have exacerbated the other
error. Again, the court did not suggest that it transformed a monetary-fraud case into
an honest-services case.

   The "dishonesty" instruction has lost favor over the years; it does not appear,
for example, in the Third Circuit's Model Jury Charges for mail, wire, and bank fraud.
*See* Model Charges (Criminal) 6.18.1341-1 & comment ("This language, found in a
number of older cases, has not been included in the model instruction."). That decline
in favor, however, had nothing to do with the "honest services" theory as such; rather,
it arose from concerns about vagueness or jurors' potential conflation of moral and
legal guilt. *See United States v. Leahy*, 445 F.3d 634, 649–51 (3d Cir. 2006)
(expressing disapproval of instruction but upholding bank fraud conviction), *abrogated
on other grounds by Loughrin v. United States*, 573 U.S. 351, 134 S. Ct. 2384 (2014).

   *Leahy* itself was clearly a fraud with money as its object, involving the use of a
bank in connection with a scheme to deprive the victim of the full price received for
repossessed automobiles. *See also United States v. Khorozian*, 333 F.3d 498, 501–03,
508–09 (3d Cir. 2003) (upholding conviction of bank fraud scheme to deposit
counterfeit checks over a challenge to a jury instruction that "a scheme or artifice to
defraud may be found 'where there has been a departure from basic honesty, fair play
and candid dealings'").

it means that the *object* of the fraud is a deprivation of the victim's intangible right to honest services, as opposed to the victim's money. Language linking a scheme to obtain money with "a departure from fundamental honesty" did not smuggle an honest-services theory into the case. No such theory was charged or presented to Mr. Ragbir's jury, and it could not have been the basis for his conviction. The case was always presented as a scheme to deprive HFC of money.

Finally, even if this jury instruction could theoretically have permitted a conviction without monetary loss, there would be no basis for *coram nobis* relief. The evidence primarily involved monetary loss; it was sufficient to support a conviction; and any legal error in the instructions could have been corrected at a retrial. The error, if any, did not entail a conviction for non-criminal conduct; it was not fundamental.

In *Stoneman,* for example, discussed at pp. 10–11, 14–15, *supra,* the Court of Appeals held that to rest a conviction solely on the (then) invalid honest-services theory would be a fundamental error, and therefore a fit subject of *coram nobis* relief. 870 F.2d at 105. Still, the Court did not grant relief, for reasons that also apply here. The *Stoneman* jury was instructed (erroneously, in the pre-§ 1346 era) that the scheme need not have had money or tangible property as its object, but could be a scheme to deprive the citizenry of public employees' "good and faithful services." 870 F.2d at 107. The evidence at trial, however, was sufficient to show that the defendant and his co-defendants in fact "schemed to cause a loss of money to the citizens of Pennsylvania." The defendant's company, the evidence showed, fraudulently obtained a public contract "at a cost of $150,000, even though another contractor had bid $35,000," and the defendants attempted to obtain an auditing contract for $8 million that could have been performed in-house for $300,000 (and was eventually performed by an outside accounting firm for $1.3 million). *Id.* at 106–07.

The charged fraud in *Stoneman*, then, had money as its object. It follows that the defendant's conduct was not outside the scope of the mail fraud statute as it then existed. If the case were retried, "a valid conviction could have been had under different [*i.e.,* corrected] instructions." *Stoneman*, 870 F.2d at 108 (quoting *Keane*, 852 F.2d at 205). Such a flaw in the instructions, correctable by a new trial, "is not the sort of fundamental defect that produces a complete miscarriage of justice" which would merit *coram nobis* relief. *Id.*

Ragbir, like the defendant in *Stoneman,* asserts an instructional error that does not rise to the level of a fundamental flaw. The charged conduct— processing and submitting fraudulent loan requests, which induced HFC to pay out hundreds of thousands of dollars—is clearly at the core of what is prohibited by the wire-fraud statute. Mr. Ragbir argues, not very persuasively, that under these jury instructions he might have been convicted, not for defrauding HFC of money, but rather on an (invalid, unexpressed) honest-services theory. Even assuming he is correct, that is the kind of error which would require a new trial, not outright dismissal of the charges. As in *Stoneman*, the facts of this case, tried pursuant to correct instructions on a deprivation-of-money theory only, could support a valid conviction.

In *United States v. Baroni*, 909 F.3d 550 (3d Cir. 2018), the defendants tried what Ragbir is attempting here: to argue that their conviction, despite appearances, was really one for honest-services fraud, and that, viewed as such, it would have been defective under *Skilling*. The Court of Appeals was unconvinced: "Defendants were charged with simple money and property fraud under Section 1343—not honest services fraud—and the grand jury alleged an actual money and property loss to the Port Authority." *Id.* at 568.

Mr. Ragbir, like the *Baroni* defendants, has it backwards; he has combed the case law for a claim of legal error and then attempted to retrofit the facts of his case to accommodate it. His case, however, was not charged or tried on an honest-services theory. A claim of *Skilling* error is simply beside the point.

Errors in jury instructions, even when demonstrated, are typically insufficient to merit *coram nobis* relief. *See Rhines,* 640 F.3d at 71. Here, I fail to detect any substantial instructional error at all. Accordingly, *coram nobis* relief based on *Skilling* is denied.

### C. Sound Reasons for Not Seeking Earlier Relief

The third prerequisite to *coram nobis* relief is that a petitioner, even one who has identified a fundamental error, must demonstrate that "sound reasons exist for failing to seek relief earlier." *See* Section III, *supra*. Because I have already held that Mr. Ragbir has not identified a fundamental error, *see* Sections IV.A & B, *supra*, I discuss this third, timeliness requirement only briefly.[22]

Mr. Ragbir's conviction became final in December 2002. *Ragbir,* 537 U.S. 1089. He initially sought coram nobis relief nearly ten years later, in 2012.[23] For failing to seek relief earlier, Mr. Ragbir offers several reasons. For example, he "filed his initial petition promptly after exhausting his remedies in challenging his removal order." His jury-instruction arguments, he says, were not available until after the Supreme Court's 2010–11 decisions in *Global-Tech* and *Skilling.* (DE 1 ¶ 65.) After being taken into immigration custody, he focused on challenging his removal, not his conviction. (*Id.* ¶ 66.) When the BIA informed him in 2012 that his challenges to his criminal conviction could not be heard administratively, but only in a post-conviction motion, he promptly filed his initial *coram nobis* petition. (DE 60 at 37.) A criminal attorney he

---

[22]    This discussion is confined to the timeliness of the substantive claims of error in the jury instructions. *See* Section IV.A & B. The timeliness of the ineffective assistance claims is discussed separately in Section V, *infra*.

[23]    The government does not make any timeliness argument based on the five years that elapsed between Mr. Ragbir's first *coram nobis* petition and his commencement of this renewed *coram nobis* proceeding. Accordingly, I do not factor the time period after the initial 2012 filing into this analysis. In that later period, Mr. Ragbir filed and withdrew petitions for *coram nobis* relief and unsuccessfully sought a presidential pardon.

retained while serving his sentence told Mr. Ragbir "there was nothing he could do." (*Id.* at 38 (quoting DE 52 at 32).)

In my opinion granting Mr. Ragbir's application for a stay *pendente lite*, I wrote that his reasons for delay in seeking relief fell "within the realm of reasonableness." (DE 40 at 30 (citing *Kovacs v. United States*, 744 F.3d 44 (2d Cir. 2014)). I made that ruling, however, in the context of deciding that the petition had a "probability of success . . . sufficient to merit a stay." (*Id.* at 31.) Based on a fuller review of the merits and Third Circuit precedent, I do not find those reasons sufficient. While Mr. Ragbir's reasons for not seeking relief earlier were sufficient to persuade the Court to stay his removal so that the merits could be considered, they do not carry the day.

Third Circuit case law emphasizes the strictness of the *coram nobis* requirement of timeliness: "[T]he 'sound reason' standard is even stricter than that used to evaluate § 2255 petitions." *Mendoza*, 690 F.3d at 159; *see also United States v. Gaudelli*, 688 F. App'x 115, 117 (3d Cir. 2017), *cert. denied,* 138 S. Ct. 261 (2017); *United States v. Glover*, 541 F. App'x 148, 150 (3d Cir. 2013). There is no rigid time limitation, but the Third Circuit has fairly consistently barred *coram nobis* petitions based on delays of less than five years. *See United States v. Contant*, 679 F. App'x 95, 97–99 (3d Cir. 2017) (relating complex history of the four years between conviction's becoming final and filing of *coram nobis* petition, during which the petitioner pursued other post-conviction relief and relief from immigration authorities); *United States v. Ishola*, 248 F. App'x 328, 328–29 (3d Cir. 2007) (three years between conviction and filing *coram nobis* petition); *Babalola*, 248 F. App'x at 412 ("Even if Babalola became aware of the consequences of her plea when she was served with a Notice to Appear in August 2004, Babalola offers no justification—let alone any 'sound reasons'—for waiting an additional two years before filing a motion for writ of error *coram nobis*.").

No case could be strictly on point, but *Mendoza*, *supra*, is similar enough to illuminate the Third Circuit's approach. 690 F.3d at 159–60. There, the

defendant learned about the immigration consequences of his conviction when his conviction occurred and the ICE instituted removal proceedings, both in 2006. Four years later, in 2010, he filed motions to withdraw his guilty plea under Fed. R. Civ. P. 32(d) and 28 U.S.C. § 2255. The following year, in 2011, he withdrew those motions and filed a *coram nobis* petition. To account for the four-year delay, Mendoza cited his mistaken belief that his cooperation with the immigration authorities would stave off deportation, and the fact that a Supreme Court case on which his petition was based, *Padilla v. Kentucky,* 559 U.S. 356, 130 S. Ct. 1473, was not decided until 2010.[24]

These, said the Court of Appeals, were not "sound reasons" for delay. Cooperation with the authorities was a condition of probation, not an entitlement to remain in the country, and any misunderstanding was not of the government's making. That counsel must advise defendants pleading guilty of potential immigration consequences was definitively established by *Padilla* in 2010, but had been amply foreshadowed. 690 F.3d at 160 (citing *Orocio,* 645 F.3d at 640 ("Lower court decisions not in harmony with *Padilla* were, with few exceptions, decided before 1995 and pre-date the professional norms that ... had long demanded that competent counsel provide advice on the removal consequences of a client's plea.")). Such a challenge, then, might not have been a sure thing, but it was available, and certainly not foreclosed, under pre-2010 law. "That the law is unsettled," the Court wrote, "does not justify a delay in filing a coram nobis petition." *Id.* Thus the Court of Appeals held that the defendant's contentions, however meritorious, were untimely: "Notwithstanding Mendoza's counsel's deficient performance, we agree with the District Court that Mendoza's unreasonable delay in filing his coram nobis petition forestalls his efforts to seek relief." 690 F.3d at 159.

---

[24]    A little context will aid in interpreting the discussion in *Mendoza. Mendoza* was decided after *Padilla,* but before *Chaidez v. United States,* 568 U.S. 342, 133 S. Ct. 1103 (2013), which definitively held that *Padilla* was not retroactive. *See* Section V.B.2, *infra.*

Ragbir's reasons for delay are similar to those in *Mendoza*, and the period of delay more than twice as long. Until 2012, he says, he was preoccupied by his pursuit of remedies aimed not at the criminal conviction but at the order of removal itself. [25] (DE 1 ¶ 66; DE 52 at 47–48.) There is no reason, however, that Mr. Ragbir, while challenging ICE's actions, could not have concurrently attacked his conviction. Like Mr. Mendoza, he claims that his ability to bring these claims depended on subsequent Supreme Court case law, specifically *Global-Tech* and *Skilling*, decided in 2010–11. I have already held, however, that those cases did not give rise to a potential challenge where none had existed before; indeed, they changed the law far less than did *Padilla*, the case on which Mendoza relied.

Mr. Ragbir's ten-year delay in asserting the errors in the jury instructions, like Mendoza's five-year delay, renders his petition untimely.[26]

In sum, the claims of error in the wire fraud jury instructions do not set forth fundamental flaws cognizable on *coram nobis*, and Mr. Ragbir has not stated sufficient reasons for his ten-year delay in asserting these claims. *Coram nobis* relief based on errors in the jury instructions is therefore denied.

---

[25]    Mr. Ragbir's contention that "pursuit of administrative remedies constitutes sound reasons for not seeking earlier relief" (DE 74 at 22) rests on cases from the Second and Ninth Circuits, including *Kovacs, supra*. (*See* DE 14 at 5–15; DE 60 at 34–39.)

[26]    Mr. Ragbir adds that some years elapsed before he fully understood the effect of his conviction on his immigration situation. During his incarceration, he testified, he consulted with a criminal attorney, John Broderick, Esq., who told him nothing could be done. (DE 52 at 31–32.) After that, "no one ever . . . told [him] about anything that could be done to vacate [his] criminal conviction." (DE 52 at 48.) It was not until 2006, Mr. Ragbir testified, that he learned his removability depended on whether the dollar loss attributable to the conviction exceeded $10,000. Before that, however, he believed the conviction, in itself, rendered him deportable; he had the same motivation to find out why; and he surely had the same incentive to attack the conviction. (DE 52 at 38, 49) The only aspect he did not understand was that a challenge to the dollar amount at sentencing could have had an effect, a misunderstanding not attributable to the government.

After hearing testimony, *see infra*, I find both legally and factually that the lag time in understanding the definition of an aggravated felony, even if it hampered Mr. Ragbir's efforts for some time, cannot furnish sound reasons for any large portion of the ten years of delay that occurred here.

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL

Because claims of ineffective assistance of counsel ("IAC") operate under specialized standards, I analyze them separately here. Mr. Ragbir asserts three theories under which his trial counsel rendered ineffective assistance: misadvice about immigration consequences (the "immigration advice" issue); stipulating to the dollar loss, instead of insisting on a hearing (the "loss stipulation" issue); failure to call a linguistics expert as a witness at trial (the "linguistics expert" issue). He also asserts that his appellate counsel was ineffective for failing to challenge the willful blindness instructions, *see* Section IV.A, *supra,* before the Court of Appeals (the "appellate IAC" issue).

After permitting the parties to conduct discovery, on May 4, 2018, I held an evidentiary hearing on the ineffective assistance claims. (The Transcript is at DE 52.) At the hearing, I heard testimony from Mr. Ragbir; from Patricia Lee, Esq., the attorney who represented him at trial; and from Dr. Robert Leonard, a professor of linguistics.

In Section V.A, I summarize general standards governing IAC claims. In Section V.B, I discuss whether the immigration advice issue establishes a "fundamental" error cognizable on *coram nobis*; in Section V.C, I discuss whether the loss stipulation issue establishes such a fundamental error; in Section V.D, I discuss the linguistics expert; In Section V.E, I discuss the appellate IAC issue; and in Section V.F, I discuss whether Mr. Ragbir has established sound reasons for failing to assert his IAC claims earlier.

### A. Ineffective Assistance of Counsel: Governing Standards

As noted above, *coram nobis* relief has three stringent preconditions.  The petitioner must demonstrate that (1) he or she is no longer in custody, but is suffering from continuing consequences of the allegedly invalid conviction, (2) there was an error of a most fundamental kind for which there was no remedy available at the time of trial, and (3) sound reasons exist for failing to seek relief earlier. (For a fuller discussion, *see* Section III, *supra.*) Here, as before, the first

requirement is conceded. As for the second, ineffective assistance of counsel may, in a proper case, constitute fundamental error that can be addressed in a post-custody *coram nobis* petition. *See United States v. Rad-O-Lite of Philadelphia, Inc.*, 612 F.2d 740, 744 (3d Cir. 1979). Claims of erroneous attorney advice, like others, are subject to the third, timeliness requirement.

Setting aside the generic hurdles to *coram nobis* relief, however, the specific standards governing any ineffective assistance claim are as follows:

The Supreme Court, in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), articulated a two-prong burden for establishing ineffective assistance of counsel: (1) that, considering all relevant circumstances, counsel's performance fell below an objective standard of reasonableness and (2) that the petitioner suffered prejudice as a result. *Id.* at 687–96; *see also Grant v. Lockett,* 709 F.3d 224, 232 (3d Cir. 2013).

In addressing the first prong, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690. Judicial scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Counsel's strategic choices made after thorough investigation of the relevant law and facts are "virtually unchallengeable," while choices made with less than entirely thorough investigation "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91; *see also Rolan v. Vaughn,* 445 F.3d 671, 682 (3d Cir. 2006); *Gov't of V.I. v. Weatherwax,* 77 F.3d 1425, 1432 (3d Cir. 1996). Whether counsel acted in a manner that was deficient is measured by a

34

standard of "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 687–88; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

The second prong of the *Strickland* test requires the petitioner to establish prejudice. *See* 466 U.S at 693. Prejudice is generally found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBride v. Superintendent, SCI Houtzdale,* 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 111–12 (2011) (internal quotation marks and citation omitted).

A court may apply the two *Strickland* prongs in either order. 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *see also Rainey v. Varner,* 603 F.3d 189, 201 (3d Cir. 2010). Failure to establish either is fatal to an ineffective assistance claim.

### B. Advice Regarding Immigration Consequences

#### 1. Introduction: Claims

Mr. Ragbir first contends that Ms. Lee provided deficient representation in relation to the immigration consequences of his conviction and sentence. (DE 1 ¶¶ 47–52.) A non-citizen is removable based on a conviction of an "aggravated felony," defined to include crimes involving "fraud or deceit" that cause a loss to the victim of greater than $10,000. Mr. Ragbir alleges that Ms. Lee told him "that his conviction could lead to deportation, but did not explain that the immigration consequences of the conviction were dependent on the

outcome of the [dollar] loss determination." (*Id.* ¶¶ 48–49.) This error, he says, led to a second: instead of insisting on a hearing, counsel advised him to stipulate to a loss figure of $350,000, far in excess of the $10,000 threshold for deportability. That second error is discussed separately in Section V.C, immediately following.

Both errors are required, however, for Mr. Ragbir's claim to function. He does not contend that the omitted advice about the $10,000 threshold affected his conviction. He does not claim that, with proper advice, he would have pled guilty instead of going to trial. With respect to his order of removal, the issue ripened only when he decided, in connection with sentencing, to stipulate to a larger dollar loss rather than contest the issue.

The government replies that there is no evidence that Ms. Lee gave Mr. Ragbir incorrect advice regarding immigration consequences; rather, she correctly advised him "that conviction of this offense could lead to deportation." (DE 9 at 31.) It differentiates this scenario from the common one in which defendants "were falsely advised that their convictions would have no immigration consequences." (*Id.* at 31–32.) In addition, Mr. Ragbir cannot show prejudice resulting from the alleged deficiency, because for purposes of minimizing Mr. Ragbir's custodial sentence, Ms. Lee had every incentive to reduce the attributed dollar loss and made every effort to do so. (*See id.* at 34.) The government also raises numerous questions regarding HFC's ability to actually recoup its losses through foreclosures and the enforceability of its security rights in some properties. (*See id.* at 35–37.)

In an earlier opinion, I found a sufficient likelihood that Mr. Ragbir, after a hearing, might prevail on certain claims, including this one. That likelihood, I found, was enough to support the grant of a stay to preserve the status quo. (DE 40 at 25–26.) Discovery and a hearing have sharpened the factual picture as to this alleged misadvice, but only to a limited degree.

Mr. Ragbir testified that counsel advised him that his conviction would likely lead to deportation, but did not explain the $10,000 aggravated felony threshold. His counsel, Ms. Lee, testified that although she was aware of the

relevant law about the deportation consequences of conviction, she could not recall the specifics of her advice about the $10,000 threshold. (Transcript 189–91.) Document discovery added little, as Ms. Lee's contemporaneous notes had not survived. *Id.* On any set of facts reasonably established by the evidence, however, I cannot find that Ms. Lee's advice, considered in the context of the law as it existed in 2000–02, fell outside the wide range of acceptable professional standards.

### 2. *Padilla*

In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court held that advice regarding deportation is included within the "ambit of the Sixth Amendment right to counsel" and that prevailing professional norms now require that defense "counsel must advise her client regarding the risk of deportation." *Id.* at 366, 367. If *Padilla* were retroactive, Mr. Ragbir's burden would perhaps be a light one. The Supreme Court later held, however, that *Padilla* announced a "new rule" that does not apply retroactively. *Chaidez v. United States*, 568 U.S. 342, 358, 133 S. Ct. 1103 (2013). "[D]efendants whose convictions became final prior to *Padilla* . . . cannot benefit from its holding." *Id.* Mr. Ragbir's conviction became final when the Supreme Court denied *certiorari*, in December 2002. *Ragbir*, 537 U.S. 1089. *Padilla* was decided eight years later, in March 2010.

*Padilla* nevertheless bears on the analysis, so I discuss its holding. The petitioner, Jose Padilla, received affirmatively incorrect advice from his attorney: when he pled guilty to a deportable drug offense, his attorney told him that he "did not have to worry about his immigration status." *Padilla*, 559 U.S. at 359. *Padilla* cited and rejected then-prevailing case law that categorically barred IAC claims based on faulty advice about immigration consequences on the basis that such consequences are "collateral" to the criminal case. *See id.* at 365 & n.9 (citing examples from the First, Fourth, Fifth, Tenth, Eleventh, and D.C. Circuits, as well as various state courts). *Padilla* reasoned that "[d]eportation as a consequence of a criminal conviction

37

is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence." *Id.* at 366. Therefore, it held that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel" and that "*Strickland* applies to *Padilla's* claim." *Id.* Evolving professional norms, the Court found, "support[] the view that counsel must advise her client regarding the risk of deportation."[27] *Id.* The Court thus held that Padilla had "sufficiently alleged a constitutional deficiency to satisfy the first prong of *Strickland*," while leaving open the question of prejudice on remand. *Id.*

The *Padilla* holding was not limited to incorrect advice, as opposed to a failure to give advice. *Id.* at 369–74. The Court found "no relevant difference between an act of commission and an act of omission in this context." Such a distinction, the Court worried, would encourage lawyers to remain silent rather than risk making a mistake, and thereby deprive defendants of "readily available" advice. *Id.* at 370–71 (internal quotation marks omitted).

*Padilla,* of course, was decided long after Mr. Ragbir's conviction. There are two scenarios, however, under which he might benefit from its holding:

> [A] defendant in collateral proceedings may benefit from a favorable Supreme Court holding only if he would have been entitled to the same outcome at the time his conviction became final—either

---

[27]    The extent of such advice varies according to the context:

> Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward … , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear … the duty to give correct advice is equally clear.

*Padilla*, 559 U.S. at 369 (footnote omitted).

[1] because the holding is not a new rule under *Teague* or

[2] because the holding, even if a new rule, nonetheless reflects the law that would have governed his own case.

*United States v. Castro-Taveras*, 841 F.3d 34, 41 (1st Cir. 2016) ([bracketed] numbers and line breaks added for clarity).

The first *Castro-Taveras* scenario does not apply because in *Chaidez, supra,* the Supreme Court held that *Padilla* promulgated a "new rule" within the meaning of *Teague v. Lane,* 489 U.S. 288, 109 S. Ct. 1060 (1989), and therefore would not be given retroactive effect. I therefore move to the second.

### 3. Pre-*Padilla* law

If Mr. Ragbir is to benefit from the rule in *Padilla,* it must be under the second *Castro-Taveras* scenario. He would need to demonstrate that the law as it existed in 2000–02 presaged the *Padilla* holding—*i.e.,* that counsel, under then-current law, performed deficiently with respect to her advice about the effect of his conviction on his removability. What Mr. Ragbir is really arguing here is that in 2000–02 there was a distinction between wrong advice and omitted advice, a distinction later erased by *Padilla.* As Ragbir sees it, pre-*Padilla* case law did not authorize an IAC claim based on *failure* to advise about immigration consequences; it did, however, authorize an IAC claim based on *incorrect advice* about immigration consequences. His claim, he says, falls in the latter, incorrect-advice category. On balance I disagree with Mr. Ragbir's analysis.

The retroactivity reasoning of *Chaidez* is significant here because it says much about the state of the law before *Padilla* was decided. The issue in *Chaidez,* of course, was whether *Padilla* represented a break with the past, *i.e.,* whether it announced a "new rule" which therefore would not be retroactive under *Teague v. Lane, supra.*

*Padilla,* according to *Chaidez,* was not a mere "garden-variety application[]" of the well-established *Strickland* standard; if *Padilla* had "merely made clear that a lawyer who neglects to inform a client about the risk of

39

deportation is professionally incompetent," it could not be regarded as announcing a new, prospective-only rule. 568 U.S. at 348–49. *Padilla,* however, "did something more": It reversed the prevailing view that "advice about deportation [was] 'categorically removed' from the scope of the Sixth Amendment right to counsel because it involved only a 'collateral consequence' of conviction." *Id.* at 349. *Padilla,* then, was not about "*how* the *Strickland* test applied" to immigration advice, but "*whether* the *Strickland* test applied" to immigration advice at all. *Id.*

Pre-*Padilla,* the case law overwhelmingly and categorically rejected IAC claims based on advice about immigration matters, which were viewed as "collateral" to the criminal case. "Before *Padilla,*" the *Chaidez* Court explained, "we had declined to decide whether the Sixth Amendment had any relevance to a lawyer's advice about matters not part of a criminal proceeding. . . . . No precedent of our own '*dictated*' the answer." *Chaidez,* 568 U.S. at 353. State and lower federal courts, not bound by any Supreme Court precedent, had "almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation." *Id.* at 351 (surveying cases). *Padilla,* however, changed all that; it "rejected the categorical approach" employed by the lower courts, which distinguished between direct and collateral consequences of a conviction, and found *Strickland* applicable "when a criminal lawyer gives (or fails to give) advice about immigration consequences." *Id.*

The petitioner in *Chaidez* argued, in terms similar to those asserted by Mr. Ragbir here, that the pre-*Padilla* case law distinguished between misadvice and omissions, and that *Padilla* broke new ground only as to the latter. As petitioner Chaidez saw it, "[c]ourts prior to *Padilla* recognized *Strickland*'s all-encompassing scope" and applied it to incorrect advice regarding immigration consequences. According to this view, *Padilla* advanced prior law only insofar as it held that "professional norms *also* require criminal lawyers to volunteer advice about the risk of deportation." *Id.* at 354 (emphasis added). That view of

*Padilla,* held *Chaidez,* was simply "wrong"; "*Padilla* had to develop new law, establishing that the Sixth Amendment applied at all, before it could assess the performance of Padilla's lawyer under *Strickland.*" *Id.* at 355.

*Padilla* and *Chaidez* themselves, then, fail to support the view that the pre-*Padilla* case law distinguished between omissions and misadvice, and allowed an IAC claim as to the latter. Indeed, that view is very close, if not quite identical, to the view that *Chaidez* explicitly called "wrong."

*Chaidez* was not moved by pre-*Padilla* holdings of "a minority of courts" that had "recognized a separate rule for material misrepresentations, regardless of whether they concerned deportation or another collateral matter." *Id.* at 356. Mr. Ragbir, too, cites scattered cases finding IAC in the pre-*Padilla* context, based on counsel's affirmative misrepresentations concerning immigration consequences. *See United States v. Chan*, 792 F.3d 1151 (9th Cir. 2015); *Kovacs v. United States*, 744 F.3d 44 (2d Cir. 2014); *United States v. Akinsade*, 686 F.3d 248 (4th Cir. 2012); *United States v. Kwan*, 407 F.3d 1005 (9th Cir. 2005); *United States v. Couto*, 311 F.3d 179 (2d Cir. 2002); *Downs-Morgan v. United States*, 765 F.2d 1534 (11th Cir. 1985); *Sasonov v. United States*, 575 F. Supp. 2d 626 (D.N.J. 2008); *United States v. Shaw,* No. 03-6759, 2004 WL 1858336 (E.D. Pa. Aug. 11, 2004); *United States v. Khalaf*, 116 F. Supp. 2d 210 (D. Mass. 1999).[28]

Given the prevalence of authority going the other way, it would be difficult to conclude that an attorney who did not press this issue in 2000 fell below professional norms. At any rate, however, almost all date from well after Mr. Ragbir's conviction became final, and only two originated within the Third Circuit. One of those two, *Sasonov, supra*, was decided almost six years after Mr. Ragbir's conviction became final. There, then-District Judge Joseph A.

---

[28]    *Lee v. United States*, 137 S. Ct. 1958 (2017), is inapposite because, while it favored vacating a 2008 conviction based on defense counsel's affirmative misadvice regarding immigration consequences, the parties had previously agreed that the defense counsel's actions were unreasonable, and the Court considered only the question of whether Lee had established prejudice. *See id.* at 1962, 1964.

Greenaway, Jr.,[29] noted that "[t]he Third Circuit has yet to decide whether a
trial counsel's affirmative misrepresentation regarding the immigration
consequences of a guilty plea falls below an objective standard of
reasonableness." 575 F. Supp. 2d at 633. Judge Greenaway accepted the
prevailing view that a failure to advise of immigration consequences would not
support an ineffective-assistance claim, but agreed with cases that found
ineffective assistance based on erroneous advice concerning immigration
consequences. *Id.* at 633–36. *Shaw, supra,* in 2004 reached a similar
conclusion based on precedent from other circuits. 2004 WL 1858336, at *3–9
(declining to adopt categorical rule, but noting that a majority of circuits had
done so and that the Third Circuit had not spoken on the issue). Those two
district court precedents, both dating from after Mr. Ragbir's convictions, come
as close as any to embracing his view of the pre-*Padilla* law that would have
applied in his case. As of 2007, five years after Mr. Ragbir's conviction became
final, the Third Circuit still had not reached the issue. *United States v.
Babalola*, 248 F. App'x at 412–13 (declining to decide issue after concluding
that the petitioner could not, in any case, have established *Strickland*
prejudice).

Those cases, I find, are outliers; they would not suffice to set a
constitutional standard of legal representation, even if they had preceded Mr.
Ragbir's conviction. Taking the precedents together, I conclude that the
"applicable circuit law, at the time the defendant's conviction became final" in
2002 was at best unsettled, and in fact was unfavorable to Mr. Ragbir's claim.
*Castro-Taveras*, 841 F.3d at 41. The general consensus was that advice as to
"collateral" immigration consequences, whether based on mistaken or omitted
advice, could never form the basis for an IAC claim. *See Chaidez, supra*; *Shaw*,
2004 WL 1858336 at *4–*7. At best, some non-controlling precedent supported
the argument that wrong advice about immigration consequences (as opposed

---

[29]    Judge Greenaway was appointed to the United States Court of Appeals for the
Third Circuit in 2010.

to an omission) could support an IAC claim. Even on the eve of the *Padilla* decision, then, there was little legal basis in the Third Circuit for an IAC claim like the one asserted by Mr. Ragbir here. At the time his conviction was obtained and became final in 2000–02, there was almost no basis for the view that effective representation under the Sixth Amendment required such advice.

### 4. Misadvice vs. omission in this case

Still, it is proverbial that the distinction between acts and omissions can be a slippery one, so, in the alternative, I consider Mr. Ragbir's claims under his charitable view of the pre-*Padilla* case law. Even so, I do not find factually that Ms. Lee's advice fell into the category of affirmative misadvice, as opposed to an omission, about immigration consequences.

Mr. Ragbir alleges that Ms. Lee "misadvised him when she said that his conviction could lead to deportation, but did not explain that the immigration consequences of the conviction were dependent on the outcome of the loss determination." (DE 1 ¶ 48.) During the hearing before this Court, Mr. Ragbir admitted that he could not recall exactly what Ms. Lee had told him, but that his best recollection of the substance of her advice was that "we have to go to trial because . . . a conviction would mean that I would be deported." (DE 52 at 16, 38.) Ms. Lee similarly testified that she did not recall exactly what she had told Mr. Ragbir concerning immigration consequences. She knew at least, however, that he "understood, prior to going to trial, that the charges he was facing had the potential for deportation." (*Id.* at 176.)

That conviction would or could lead to deportation was not in itself erroneous advice. Indeed, the few pre-*Padilla* "misadvice" cases have generally involved incorrect advice that a conviction would *not* lead to removal, leading a defendant to plead guilty instead of going to trial—precisely the opposite of what happened here.

Pretrial advice that conviction would lead to deportation, even if it could have been more detailed, was essentially correct. Mr. Ragbir faced seven felony fraud charges which allegedly caused hundreds of thousands of dollars in

losses to the victim. Many contingencies remained open, of course; he could have been convicted of some but not all of the conduct, or ICE might have exercised its discretion to permit Mr. Ragbir to remain. But a competent lawyer in Ms. Lee's position would be justified in believing that if the defendant were convicted, he would almost certainly become removable.

The defect that Mr. Ragbir alleges is that Ms. Lee did not expand upon her statement by explaining that his conviction could lead to deportation, *except in the unlikely event that he was convicted, but the resulting losses to HFC were ultimately determined to be less than $10,000*. It is difficult to find, however, that the omission of a qualifier along those lines could be considered an act of affirmative misadvice.[30]

The context of the statement or statements is also important. Ms. Lee seems to have told Mr. Ragbir that conviction would lead to deportation during the period leading up to trial. (DE 74 at 3) At that time, conviction or acquittal, not sentencing, would presumably have been the central topics of conversation. Mr. Ragbir does not assert that the advice infected his decision not to plead guilty; indeed, pleading guilty would only have hastened and enhanced his removable status.[31]

Mr. Ragbir compares Ms. Lee's actions to those of the defense counsel in *United States v. Kwan*, 407 F.3d 1005, urging that "to provide some immigration advice, along with the failure to provide the advice that mattered when it mattered[ ,] demonstrated that defense counsel 'effectively misled' his client." (DE 74 at 6–7.) In *Kwan*, as in most immigration-advice cases, the claimed error was incorrect advice that a defendant would *not* be deportable.

---

[30]    Mr. Ragbir's own briefing inevitably slips into describing this alleged deficiency as an omission—*i.e.*, that Ms. Lee *failed* to tell him that removability was also contingent upon a finding of loss exceeding $10,000. (*See* DE 1 ¶¶ 48, 50; DE 60 at 13–14; DE 74 at 2–3, 6).

[31]    The real prejudice that Mr. Ragbir alleges does not stem from this pretrial advice or the decision to go to trial, but rather from his later decision to forgo a loss hearing during the sentencing phase. That issue, a separate one, is discussed in the following section. (*See* DE 1-1, Ex. B at ECF p. 11, ¶ 9; DE 60 at 14; DE 74 at 6.)

Kwan's attorney advised him that accepting a guilty plea would create a possibility, but "not a serious possibility," of deportation. 407 F.3d at 1008. After Kwan accepted the plea, but before sentencing, the Illegal Immigration Reform and Responsibility Act of 1996 was enacted, lowering the aggravated-felony trigger for a theft offense from a five-year sentence to a one-year sentence. *Id.* at 1008–09. Kwan's counsel failed to advise him of this change in the law, which made deportation a virtual certainty, in time to permit a withdrawal or renegotiation of the plea. *Id.* at 1009.

An attorney must explain, in layman's terms, the factors relevant to key decisions in the case, such as the decision whether to go to trial. Ms. Lee accurately advised that, based on the facts known at the time, an order of removal was a very likely consequence of conviction.

To summarize, under the pre-*Padilla* case law then in effect, no breach of the attorney's Sixth Amendment duty of effective assistance arose from advice about collateral immigration consequences. Even assuming there was such a duty, confined to affirmatively incorrect advice, that duty would not have been breached. In consideration of all the factors discussed above, I find that Mr. Ragbir has failed to meet his burden of showing that Ms. Lee's allegedly incomplete advice to him concerning immigration consequences deprived him of his Sixth Amendment right to effective counsel so as to constitute a fundamental error for the purpose of a *coram nobis* petition. Relief on this ground must be denied.

### C. Hearing vs. Stipulation of Loss Amount

#### 1. The claim and the "fundamental" threshold

The real gist of Mr. Ragbir's IAC claim lies in its second component. Because Ms. Lee did not advise him of the $10,000 aggravated-felony threshold, says Ragbir, she rendered ineffective assistance in connection with sentencing. At that point, he stood convicted of the overarching conspiracy, as well as the substantive wire fraud counts. Had he known about the $10,000 threshold, he says, he would not have stipulated to a loss range of $350,000 to $500,000, but would have exercised his right to a factual hearing on the

45

amount of loss in connection with sentencing. (*Id.* ¶ 51.) At such a hearing, he says, a properly-prepared attorney could have established "that the loss associated with the indicted loans was less than $10,000, because the value of the collateral properties securing the indicted loans, which HFC could be expected to recover, exceeded the value of HFC's disbursements on those loans." (*Id.* ¶ 57.) Additionally, and in the alternative, Mr. Ragbir contends that his attorney should have "negotiated a loss stipulation that distinguished between the loss tied to the counts of conviction and the loss tied to unindicted conduct." (*Id.* ¶ 52.)

The government responds that Ms. Lee provided diligent and vigorous representation at all stages of the proceeding. (DE 9 at 28.) She reviewed discovery and subpoenaed additional documents from HFC. She challenged the higher loss findings in the draft presentence report, provided the court with submissions concerning loss, and obtained additional time to investigate loss issues. (*Id.* at 28–29.) "Only after putting the government to its proof on each and every point" did Ms. Lee advise Mr. Ragbir to stipulate to the loss amount. (*Id.* at 29.) Judge Bassler, who had presided at trial, commented during the sentencing hearing that, "There's no doubt in my mind that that figure could be larger, but in any event, he should be responsible for restitution in the amount of $350,001." (*Id.* at 30 (quoting DE 9-2, at 32–33).)

The government additionally contends that Ms. Lee, far from ignoring the value of the collateral, "forced the government to subtract out the value of the collateral property from the face value of the fraud loans." As a result, the presentence report noted that "estimated loss was agreed upon based on the total out-of-pocket expenses suffered by HFC, reduced by payments already made to HFC, and the amount HFC can expect to recover." (*Id.* at 34.) That analysis, however, did not reduce the loss to anything like $10,000. (*Id.*)[32]

---

[32]    The distinction between loss from "indicted" and "unindicted" loans, the government says, ignores Mr. Ragbir's conviction of the overarching conspiracy count, which swept in the entire scheme. (*Id.* at 35.) At any rate, while Mr. Ragbir has

I pause at the threshold to observe that this claim of IAC, confined to the determination of dollar loss at the sentencing phase, does not set forth a fundamental error that warrants *coram nobis* relief. *See Stoneman*, 870 F.2d at 106. It does not implicate the court's jurisdiction or the validity of the criminal proceeding. It involves alleged errors that, at worst, resulted in a stipulation to an exaggerated dollar loss in connection with the sentencing phase following a conviction at trial. *See United States v. Tonagbanua*, 706 F. App'x 744, 747–48 (3d Cir. 2017) (concluding that petitioner's claim that restitution amount could have been reduced had counsel challenged the presentence report findings did not show a fundamental error meriting *coram nobis* relief). It does not suggest a conviction for something that was "not a crime." The claimed errors are ones which, if recognized at the time, would not undermine the validity of the prosecution but merely require a new sentencing hearing. (*See* DE 14 at 27–28.) Similar errors are routinely corrected on direct appeal by means of a limited remand for resentencing.[33]

I recognize that this alleged sentencing error had implications for Mr. Ragbir's removal status. I reiterate, however, that in this *coram nobis* proceeding we are not litigating the permissibility of removal, but the validity of the criminal conviction, on a standard exceeding that which obtains on habeas corpus. *See* Section III, *supra*. I cannot conclude that this error is fundamental in relation to the criminal conviction itself.

In addition and in the alternative, however, I nevertheless examine the merits of the claim of sentencing error.

---

proffered evidence that four of the properties had value, he has not demonstrated that HFC held an enforceable security interest in these properties. (*Id.* at 36–37.)

[33]    *See, e.g., United States v. Advantage Med. Transp. Inc.*, 698 F. App'x 680, 684–89, 692 (3d Cir. 2017) (remanding for recalculation of losses and resentencing upon finding that the inclusion of certain transactions related to Medicare-fraud conviction was improper); *United States v. Latimer*, 54 F. App'x 105, 109–10 (3d Cir. 2002) (remanding "only for recalculation of loss for purposes of sentencing and allocation of restitution" where no evidence was adduced to show that related loss arose from conduct that was illegal or wrongful).

### 2. Deficient performance and prejudice in relation to the loss figure

After reviewing the record and conducting a hearing, I find that competent counsel made a reasonable strategic judgment that the decision to stipulate was advantageous. There is little here to suggest that Ms. Lee failed to pursue the dollar-loss issue vigorously, or that she lacked the incentive to do so. Whether or not the dollar loss bore on removability, it was central to the issue of how long a sentence Mr. Ragbir would serve, a matter of paramount concern. The record does not suggest that Ms. Lee was misguided in her judgment that the defendant, at a hearing, had no realistic chance of reducing the agreed loss figure of $350,000 at all, let alone to a figure of $10,000 or less. And I find that Ms. Lee took appropriate investigative and other steps to minimize the loss figure while avoiding the risk inherent in a hearing that would throw the issue open to something far worse.

At the *coram nobis* evidentiary hearing, Ms. Lee testified credibly that she "vehemently" disputed the probation department's initial loss calculation of over $1 million. Her efforts took the form of, *inter alia,* objections to the draft presentence report and submission of a sentencing memorandum to the court. (Transcript, DE 52 at 191–92.) Ms. Lee recounted that "between March of 2001 and August of 2001, [she] was looking for analysis of title searches, appraisals, deeds, defects in title, ability of [HFC] to be able to recover the properties." She also attempted to persuade the government to begin the loss calculation with actual disbursements (rather than each loan's face value), and to exclude bargained-for interest. (*Id.* at 192–93.) Meanwhile, she was opposing attempts by HFC to inflate the loss figure by "advocating to put other things in," such as investigation fees and costs of potential foreclosures. (*Id.* at 193–94.)

Those efforts bore fruit. Ms. Lee explained that, "after months of briefing, negotiations, discussions with my co-defendant counsel and also AUSA Dow," the government agreed to some of her demands. These included starting the calculation from actual disbursements and agreeing to obtain property records and appraisals that might demonstrate some offsetting value. (*Id.* at 194.) The

analysis and calculations were done with significant involvement by Mr. Ragbir himself. (*Id.* at 195–96.) Ms. Lee obtained an adjournment when it appeared that she had not yet received enough information about title searches on the properties. (*Id.* at 197.)

Even so, Ms. Lee further explained, the government was seeking a sentence based on a loss exceeding $800,000. It "took a lot of convincing" to get below that figure to a stipulation of loss in the range of $350,000. (*Id.* at 203, 242.) In assessing the loss, Ms. Lee expressed concern that HFC would not be able to foreclose on some of the loans. She recalled investigating one that was based upon false title documents, making foreclosure impossible. (*Id.* at 204, 207–08.) As to the loans, Ms. Lee conducted investigations "as to whether or not there were appraisals on the properties, recorded mortgages, and clear . . . title." (*Id.* at 210.) [34]

When asked directly, Ms. Lee testified that she thought there was no chance she could have gotten the loss down to $10,000; but "[i]f [she] could have gotten Mr. Ragbir down to the next range, we would have gone for it."

> So I did an assessment. I unfortunately don't have any of my handwritten notes or any of the other information that I received. But just looking at what I did go through and was able to be preserved by Mr. Zegas, there were a number of problems here that prevented getting the five indicted loans, coupled with the three other loans presented at trial below $10,000.

(Transcript 212.)[35]

---

[34]    This account is also consistent with the observation in the Presentence Report that "the estimated loss was agreed upon based on the total out-of-pocket expenses suffered by HFC, reduced by the repayments already made to HFC, and the amount HFC can expect to recover on its own." (PSR ¶ 33, DE 1-3 at 16)

[35]    Ms. Lee's immediate problem at the time, of course, was to bring the total down to what she called "the next range," *i.e.*, the Sentencing Guidelines loss range below $350,000, which would have reduced Mr. Ragbir's sentencing exposure. *See* U.S.S.G. § 2F1.1. She reasonably perceived that she would be unable to do so.

I do not attach great weight to Mr. Ragbir's contention that Ms. Lee should somehow have forced the government to offer a plea or otherwise distinguish between "indicted" and "unindicted" loans. The so-called "indicted" loans (the five plus three), even viewed in isolation, were well above the $10,000 threshold. In addition, although

Applying the highly deferential examination required by *Strickland*, the Court does not find that Ms. Lee's conduct was deficient in these circumstances. *Strickland* found that an attorney "has a duty to make *reasonable* investigations." 466 U.S. at 691 (emphasis added); *cf. United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (noting that "the failure to conduct *any* pretrial investigation generally constitutes a clear instance of ineffectiveness" (emphasis added; internal quotation marks omitted)). Ms. Lee provided extensive testimony regarding her efforts to minimize the calculated loss amount and to reach a favorable stipulation. Mr. Ragbir has not meaningfully disputed the accuracy of her statements. Accordingly, Mr. Ragbir's contentions that Ms. Lee made essentially no efforts to determine what actual loss would be determined at a hearing or to negotiate for a lower loss amount are roundly refuted by the evidence before the Court.[36]

---

a strict segregation might have been more convenient in later immigration proceedings, it was not required in order for Ms. Lee to fulfill her duty of effective representation. In the subsequent immigration proceedings, Mr. Ragbir was not foreclosed from making his argument with respect to indicted vs. uncharged conduct. Nor did the BIA refuse to look behind the face of the stipulation to determine whether the $10,000 loss pertained to the offenses of conviction, as opposed to related conduct.

On the contrary, the U.S. Court of Appeals for the Second Circuit upheld the BIA's "clear and convincing finding that the $350,001 restitution order included more than $10,000 attributable to the crimes of conviction." *Ragbir v. Holder,* 389 F. App'x 80, 83–84 & n.6 (2d Cir. 2010). It also held that Ragbir was not denied a fair opportunity to contest the loss amount, holding that case law permitted him to introduce extrinsic material, including trial transcripts and other evidence. *Id.* at 85. Thus, even if trial counsel had not distinguished between indicted and uncharged losses, the opportunity to do so was not lost. Ragbir could have, and did, introduce evidence before the BIA. He did not, however, prevail; the BIA found that the conviction was for an aggravated felony, and the Second Circuit upheld that determination.

[36]    A live hearing, in any event, was not necessarily available for the asking. Whether to require live testimony, as opposed to documentary proofs, would have been a discretionary call for the district court. *See United States v. Hoover*, 301 F. App'x 127, 129 (3d Cir. 2008) (citing *United States v. Houston*, 217 F.3d 1204, 1206-07 (9th Cir. 2000) and U.S.S.G. § 6A1.3(a) (comment)). The risk of a contested proceeding, of course, would have been that the district court, like the Probation Office, could have taken a broad view of the scope of the scheme and found a higher figure.

I observed Ms. Lee's demeanor at the hearing, and I found her account credible, internally consistent, and consonant with what documentary evidence remained. I find factually that Ms. Lee was contemporaneously aware of and sensitive to the loss-valuation issue now raised by Mr. Ragbir; that she conducted a review and examination, appropriate under the circumstances, of the possible offsets to the face amount of the loss; that she aggressively pursued the issue with the government attorneys and obtained a very substantial reduction in the government's proposed loss figure; and that she made a reasonable strategic decision to lock in that concession with a stipulation. Mr. Ragbir, who had been a loan processing professional, participated fully in the analysis of the loss, and does not deny that, through counsel, he stipulated to the $350,000 range.

Mr. Ragbir has failed to meet his burden to show that Ms. Lee's representation was deficient because she failed to prove a loss below $10,000 and advised him to stipulate. To be clear, this failure would also doom the first IAC ground (failure to advise as to the $10,000 threshold), because that claim has no ultimate significance apart from its effect on the loss amount, an issue addressed in connection with sentencing. (*See* Section IV.C, *supra*.)

### D. Failure to Call a Linguistics Expert

Mr. Ragbir next alleges that Ms. Lee rendered ineffective assistance because she could have done more to challenge his statement to the West Orange police, which was introduced in evidence against him at trial. Ms. Lee's representation fell short, Mr. Ragbir says, because she failed to "to consult with an independent expert in the field of linguistics, who could have determined more conclusively whether or not the introduced statements could possibly have been a verbatim transcription of Mr. Ragbir's conversation with police, as the prosecution claimed." (*Id.*)

On this *coram nobis* application, Mr. Ragbir proffered an expert report and testimony of Dr. Robert Leonard, a highly qualified and credentialed expert in the field of forensic linguistics. Dr. Leonard opined as to the type of expert

linguistic testimony that could have been presented at trial. (DE 1-1, Ex. G ("Report"); DE 52 ("Transcript"), pp. 139–70).

Dr. Leonard's report analyzed whether the written confession[37] was likely to be "a verbatim transcript of Mr. Ragbir's exact words" to the police. (*See* DE 1-1, Ex. G ¶ 30.) To make that determination, Dr. Leonard compared the written confession with a recording of Mr. Ragbir delivering a public speech in 2013. (*Id.* ¶ 33.) The majority of the sentences in the recording of Mr. Ragbir's speech included "extensive hesitations, repetitions, false starts, pause fillers, and self-corrections," collectively described as "disfluencies."[38] The written confession, however, contained no such disfluencies. (*Id.* ¶¶ 37–38.) The 2013 speech included frequent "discourse markers" (informal transition words like "well" or "see"); the written confession, however, included none. (*Id.* ¶¶ 39–43.) Dr. Leonard concluded that the confession was not a "verbatim" transcription of Mr. Ragbir's words to the police. (*Id.* ¶¶ 44–45.)

At the evidentiary hearing, Dr. Leonard further explained his process and repeated the conclusions of his report. (Transcript 147–56.) On cross-examination, Dr. Leonard admitted that the purported confession was signed by Mr. Ragbir at the bottom of each page. (*Id.* at 161–63.) He explained that even skilled transcribers sometimes "omit fillers because it's typically clear to them that there is no, quote/unquote, information in them." He disputed, however, that the same was true of false starts or discourse markers. (*Id.* at 164.) Dr. Leonard further acknowledged that while Detective Mignone, at trial, had characterized the statement as "verbatim," it was possible that he (a police officer) and Dr. Leonard (a professor of linguistics) "might have a slightly different definition of 'verbatim.'" (*Id.* at 166–68.)

---

[37]    Actually, there were two statements to the West Orange police. Dr. Leonard, however, only analyzed one. References to the confession in this section are to the statement that Dr. Leonard analyzed.

[38]    A disfluency is defined as an "[i]nability to produce a smooth flow of speech sounds in connected discourse; the flow of speech is characterized by frequent interruptions and repetitions. *Disfluency*, Stedmans Medical Dictionary 259120 (2014).

Ms. Lee did not fail in her duty to challenge the statement to the West Orange police. She brought a motion to suppress, at which she cross-examined Det. Mignone. (Transcript 180) She also cross-examined Mignone at trial in an attempt, presumably unsuccessful, to undermine the statement.

In addition, as Mr. Ragbir acknowledged, Ms. Lee called Sheila Ragbir to testify at trial that the confession "doesn't sound like my husband . . . he doesn't run on for sentences like that." (*Id.* at 60.) At the hearing, Ms. Lee explained her strategy: Sheila Ragbir, she thought, would be a good witness because "she would be the person that would best know [Mr. Ragbir's] language." (*Id.* at 184.)[39]

The decision to rely on cross-examination and the testimony of Sheila Ragbir to question the authenticity of the confession did not violate norms of legal representation. Such strategic choices are "virtually unchallengeable." 466 U.S. at 690–91; *see also Weatherwax,* 77 F.3d at 1432. It might have been possible, of course, to introduce additional testimony of a linguistics expert, but it was far from necessary. A reasonable attorney could have wished to focus the jury on Sheila Ragbir as the face of this argument, perhaps contrasting her demeanor with that of the police officer. *See, e.g., Cullen v. Pinholster,* 563 U.S. 170, 193–94 (2011) (recognizing reasonableness of "family sympathy defense"). In addition, a seasoned defense attorney might well conclude that calling an academic expert to make a commonsense point could backfire. A jury could feel they were being condescended to, or misdirected from the pertinent issue (whether the confession was accurate) to one less

---

[39]    In addition, calling Sheila Ragbir for this limited purpose was "a narrow way to get her on the stand with limited cross-examination, and she could be sort of a humanized face for Mr. Ragbir because he could not take the stand." (*Id.*) Mr. Ragbir "could not take the stand," Ms. Lee explained, because he had also given a "very damaging" factual proffer to the United States Attorney's Office in connection with plea negotiations. The proffer, as is usual, apparently could not be introduced on the government's case, but the prosecutor would have moved for its admission if Mr. Ragbir testified. (Transcript 181.) She stated that the proffer was consistent with the statements to the West Orange police. (*Id.* at 182–83.) The proffer was shown to Ms. Lee to refresh her recollection, but I do not consider it substantively; rather, I have cited Ms. Lee's testimony about its existence to explain her strategy.

pertinent (whether it was "verbatim"). Given the high level of deference owed to Ms. Lee's decision on this matter, and the prohibition on reevaluating trial choices with the benefit of hindsight, *see Strickland*, 466 U.S. at 689, I must find that Ms. Lee's conduct relating to this issue was not deficient.

In any case, having heard the presentation of Dr. Leonard and reviewed the record, I cannot find that any arguable error was prejudicial. Where the alleged error is failure to call an expert witness, the *Strickland* prejudice question, even on direct appeal or ordinary collateral review, "is whether presenting the jury with expert testimony would have raised serious questions regarding the prosecution's case such that there is a reasonable probability that there would have been a different outcome at trial." (DE 60 at 20 (quoting *Showers v. Beard*, 635 F.3d 625, 631–34 (3d Cir. 2011).)

The gist of Dr. Leonard's expert opinion is that the confession did not contain hesitations, filler phrases, and other informalities found in spontaneously spoken language. While it refers to Mr. Ragbir's 2013 speech, the opinion does not really depend on any feature of Mr. Ragbir's idiolect. Rather, Dr. Leonard seems to suggest that the written confession does not accurately reflect the way that *anyone* spontaneously speaks. A lay juror could easily grasp that proposition without expert help. Everyone knows that unprompted speech contains fillers, pauses, and false starts; anyone could read the confession and see that it contains none of these. By the same token, however, lay people would understand why a police officer taking down a report of a confession might not include them.

What Dr. Leonard demolished was the proposition that the West Orange police statement was truly a "verbatim transcript" (Transcript 161), like one prepared by a professional court stenographer. In doing so, however, he demolished a straw man. In using the term "verbatim," Detective Mignone perhaps gave himself too much credit. Still, Dr. Leonard himself admitted that a police officer might not share his specialized definition of the term "verbatim." Nor did he opine on how the term "verbatim" might be differently interpreted by

members of different professions; he simply decided to "take the detective at his word." (Transcript 168.)

On cross-examination, Dr. Leonard underlined the limited scope of his opinion. He was not saying that the confession was false or coerced (although he has done considerable academic work in that area as well)—only that it was not a verbatim transcript. (Transcript 159–61, 165–66.) So expert testimony might have impeached Detective Mignone's less-than-rigorous use of the term "verbatim" to describe the statement. What it would not do is cast doubt on the statement's substantive content.

Mr. Ragbir's confession contained detailed content, such as this:

> He [Kosch] told me that he wanted me to do business with him through my company [HFC] and set up real estate loans for people that he would send to me as referrals. He told me that he wanted to get the money from the loans and would send people to me to use false names and information and offered to me one point of each loan. . . . I told him that I would do it for him.
>
> * * * *
>
> He [Kosch] is the guy that was running the whole scheme through me at my job Household Finance between December 1998 and now. He has organized the filing of 1.5 million dollars worth of fraudulent loans by using me to process the loans through Household Finance and allow others to assume false identities to apply for the loans.

*Ragbir*, 38 F. App'x at 791–92 (brackets in original) (quoting Ragbir's statements to police). Furthermore, as reported by Dr. Leonard, Mr. Ragbir's statement to police contained "a string of 15 or 20 names and very precise amounts with absolutely no hesitation." (Transcript 153.) *See also Ragbir*, 38 F. App'x at 792 ("Later in that statement, Ragbir lists twenty-one different loans that he fraudulently submitted under his arrangement with Kosch."). The information about the names or aliases of the customers, the dollar amounts of

loans, and so on, is not criticized as inaccurate. But it seems the police cannot win; the list is said to be suspiciously precise.[40] (Transcript 153.)

Dr. Leonard also acknowledged that each page of the confession is signed at the bottom by Mr. Ragbir, indicating his assent to the contents. (Transcript 162) No evidence of forgery was proffered.

From the omission of "ums" and "wells" from a complex, detailed statement signed on each page by Mr. Ragbir, to a conclusion that the statement was a fabrication by the police is simply too great a leap. Ms. Lee did attack the validity or accuracy confession on various grounds, including lay-linguistic ones. I find little to no chance that this incremental expert testimony could have altered the jury's verdict.

For these reasons, I do not find that the failure to call a linguistics expert rendered Ms. Lee's performance deficient or prejudiced the defendant.

### E. Ineffective Assistance of Appellate Counsel

Finally, Mr. Ragbir asserts that he received ineffective assistance from his counsel on direct appeal, because Mr. Fusco failed to brief the trial court's allegedly erroneous inclusion of a willful-blindness jury instruction. (DE 1 ¶¶ 62–64.) Mr. Ragbir alleges that prejudice resulted because the instruction itself was faulty, for the reasons expressed above. *See* Section IV.A, *supra*. (DE 1 ¶ 64.)[41]

I have already found that the willful-blindness instruction error itself does not merit *coram nobis* relief. *See* Section IV.A, *supra*. A second-order claim

---

[40]    The record does not disclose the means by which the police officer obtained this business information, if not from Mr. Ragbir.

[41]    The only question actually preserved for appeal was not that the willful blindness instruction contained erroneous language, but that it should not have been given at all. Appellate counsel has the discretion, and even the duty, to select the strongest issues to pursue. *United States v. Gray*, 558 F. Supp. 2d 589, 595 (W.D. Pa. 2008) (§ 2255 case, citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Because a willful blindness instruction is properly given where the evidence would support a jury finding, *see Stadtmauer*, 620 F.3d at 259–60, Mr. Fusco would have been reasonable in estimating that such an issue had little chance of success on appeal, especially on a plain error standard. *See* Fed. R. Crim P. 52(b); *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770 (1993).

that a related issue was appropriate for appeal should be denied as well. It adds little to the rejected argument that the instruction was invalid in the first place and therefore undermined the conviction.

In addition, a writ of error *coram nobis* is not a suitable vehicle for raising a claim that a defendant received ineffective assistance from appellate counsel.

That conclusion is inherent in the nature of the writ, which is "a step in the criminal case." *Morgan*, 346 U.S. at 505 n.4. It was historically a means to permit a court to correct inaccuracies in its own judgments after the permissible time to alter a final judgment had elapsed. *See United States v. Mayer*, 235 U.S. 55, 67–68 (1914). A *coram nobis* application is thus "properly viewed as a belated extension of the *original proceeding* during which the error allegedly transpired." *Denedo*, 556 U.S. at 912–13 (emphasis added).[42] Neither the doctrine of *coram* nobis nor the All Writs Act creates jurisdiction; a court considering a *coram nobis* petition relies on the jurisdiction it possessed over the original proceeding. *Id.* at 913–14 ("Because respondent's request for *coram nobis* is simply a further 'step in [his] criminal' appeal, the NMCCA's jurisdiction to issue the writ derives from the earlier jurisdiction it exercised to hear and determine the validity of the conviction on direct review." (alteration in original)).

That is the very logic that has led a number of Courts of Appeals, including the Third Circuit, to find that a federal court may not grant *coram nobis* relief as to a state-court conviction. *See Obado v. New Jersey*, 328 F.3d 716, 718 (3d Cir. 2003) (agreeing with other Circuits "that *coram nobis* is not available in federal court as a means of attack on a state criminal judgment."). *Obado* relied in turn on *Lowery v. McCaughtry*, in which the Court explained that "the 'usages and principles of law' send an applicant to the court that

---

[42]    *Denedo* cited *United States v. Beggerly*, 524 U.S. 38, 46 (1998), for the proposition that "an 'independent action'—which, like *coram nobis*, is an equitable means to obtain relief from a judgment—'may be regarded as ancillary to the [prior] suit, so that the relief asked may be granted by the court which made the decree in that suit" 556 U.S. at 912–13 (alteration in original).

issued the judgment," because the writ "arose as a device to extend the period (originally limited to the term of court) in which the judge who rendered a decision could reexamine his handiwork." 954 F.2d 422, 423 (7th Cir. 1992). *See also Sinclair v. Louisiana*, 679 F.2d 513, 514 (5th Cir. 1982) ("A writ of error coram nobis can only issue to aid the jurisdiction of the court in which the conviction was had."); *accord Thomas v. Cunningham*, 335 F.2d 67, 69 (4th Cir. 1964).

While precedent is lacking, I am persuaded that the same logic—that *coram nobis* jurisdiction is confined to the court that issued the judgment— would bar any attempt via *coram nobis* to correct an error that occurred before the Court of Appeals. I have not located any case in which a federal trial court has awarded *coram nobis* relief based upon ineffective assistance of appellate counsel.

I have already rejected the underlying substantive error that Mr. Ragbir faults his appellate counsel for failing to raise on appeal. In addition, a court has *coram nobis* jurisdiction to correct only its own judgments. I therefore deny relief on this claim of ineffective assistance of appellate counsel.

### F. Sound Reasons For Failing to Raise IAC Claims Earlier

In relation to the IAC claims in particular, Mr. Ragbir argues that he could not have sought relief earlier. The timeliness issue is discussed in relation to the substantive claims at Section IV.C, *supra*. I supplement that discussion as follows.

Mr. Ragbir's reason for not asserting IAC claims, he asserts, is that the Supreme Court had not yet decided *Lafler v. Cooper*, 566 U.S. 156, 132 S. Ct. 1376 (2012). In *Lafler,* the prosecution conceded that that a criminal defendant had received faulty advice in connection with his decision to reject a plea offer. As a result, the defendant went to trial, which resulted in his conviction and the imposition of a sentence harsher than the one offered in the rejected plea bargain. The question before the Court in *Lafler* concerned "how to apply *Strickland's* prejudice test where ineffective assistance results in a rejection of

the plea offer and the defendant is convicted at the ensuing trial." 566 U.S. at
163. *Strickland* prejudice, the Court held, was not erased by a jury finding of
guilt; given the modern reality that most criminal cases are disposed of by
guilty pleas, the concept of prejudice had to encompass the regularity and
fairness of plea procedures. Prejudice was present here because the defendant
demonstrated that, but for the defective advice, he would have accepted the
advantageous plea deal. *Id.* at 174. The majority opinion discounted the
argument that its holding would open the proverbial "floodgates"; the lower
courts, it wrote, "have recognized claims of this sort for over 30 years . . . ." *Id.*
at 172, citing *id.* at 164 (citing cases from eight Courts of Appeals, including
*United States v. Day,* 969 F.2d 39, 53–45 (3d Cir. 1992)).

Even if *Lafler* had announced a wholly new doctrine, it would not have
much relevance to the issue of whether Mr. Ragbir had sound reasons for not
bringing his ineffective assistance claims earlier. His claim has little in common
with that in *Lafler* (which involved a defendant who regretted rejecting a
favorable guilty plea deal); the situations are not remotely comparable. Nor is
Ragbir claiming to have been surprised after the fact by an unanticipated
disaster in the form of an order of removal; indeed, he always believed removal
was inevitable as the result of his conviction. Rather, he says that faulty advice
prevented him from perceiving a potential escape hatch. But surely he was on
notice of the $10,000 aggravated felony threshold at or about the time he
received his order of removal in 2006. He did not assert his IAC claim, however,
until 2012.

Setting aside the inadequacy of the IAC claims, then, I find that there are
no sound reasons for Mr. Ragbir's failure to assert those claims at some point
long before 2012.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Ragbir's petition for a writ of error *coram nobis* will be denied. The appeal of a decision on a *coram nobis* petition does not require a certificate of appealability. *See Baptiste*, 223 F.3d at 189 n.1. An appropriate order will be entered. The order will include a ten-day extension of the stay *pendente lite* in order to permit any relevant applications to be made.[43]

DATED: January 25, 2019

_____

KEVIN MCNULTY
United States District Judge

---

[43]    The most recent information supplied to the Court was that Mr. Ragbir's removal was scheduled to occur on January 28, 2019.